855 So.2d 968 (2003)
Samantha K. LEVY and Lars Levy
v.
BAYOU INDUSTRIAL MAINTENANCE SERVICES, INC. and Transcontinental Insurance Company.
No. 2003 CA 0037.
Court of Appeals of Louisiana, First Circuit.
September 26, 2003.
Rehearing Denied October 29, 2003.
*971 Thomas L. Mahfouz, Morgan City, Dale P. Martin, Broussard, Counsel for Plaintiffs/Appellees, Samantha Levy and Lars Levy.
Gary J. Beauchamp, Baton Rouge, Counsel for Intervenor, State of Louisiana, Office of Risk Management.
George L. LaMarca, Metairie, Counsel for Defendants/Appellants, Bayou Industrial Maintenance Services, Inc., and Transcontinental Insurance Company.
Before: WHIPPLE, KUHN, and McDONALD, JJ.
WHIPPLE, J.
Defendants, Bayou Industrial Maintenance Services, Inc. ("BIMS") and Transcontinental Insurance Company, appeal from a judgment of the trial court awarding damages in favor of plaintiff, Samantha K. Levy, and her husband, Lars Levy, as a result of injuries sustained by plaintiff in a slip and fall accident at her place of employment. For the following reasons, we reverse in part; affirm in part; vacate in part and remand.

FACTS AND PROCEDURAL HISTORY
On March 26, 1999, plaintiff, while employed as a social services counselor by St. Mary Alcohol and Drug Abuse Clinic ("ADAC"), slipped and hit her head on the floor while walking into a co-worker's office at ADAC. Plaintiff sustained a concussion and subsequently suffered from post-concussion syndrome.
Joyce Gates, a janitor employed by BIMS, had recently mopped the hallway where plaintiff slipped. BIMS contracted with ADAC to provide janitorial services. Prior to and after her fall, plaintiff did not see a "Wet Floor" sign displayed in the area, although there were two "Wet Floor" signs readily available for use by BIMS. As a result of her fall and resulting injuries, plaintiff and her husband filed a petition for damages against BIMS, claiming that the negligence of its employees was *972 the sole and proximate cause of the accident.
The matter proceeded to a bench trial on June 6 and 7, 2002. After hearing the testimony and considering the evidence, the trial court awarded judgment in favor of plaintiff and against BIMS, as follows[1]:

Past Lost Wages: $ 41,399.00
Future Loss Wages: $267,195.00
Future Lost Earnings (July 1, 2002-July 1, 2003): $ 7,331.74
Health Ins. from January 2000 through Trial: $ 3,600.00
Health Ins. for 12 Months Following Trial: $ 1,440.00
Maid Services: $ 56,936.00
Future Medical Expenses:
 Depakote: $ 30,124.00
 Paxil: $ 47,291.00
 Imitrex: $ 84,399.00
 TENS Unit: $ 55,149.00
 Psychotherapy: $ 5,200.00
 Lab Costs $ 18,911.83
 Dr. Gaddis: $ 13,951.00
Past Medicals: $ 64,079.43
Loss of Enjoyment of Life: $ 50,000.00
Permanent Disability and Impairment: $ 30,000.00
General Damages: $125,000.00
Loss of Consortium: $ 75,000.00

Thus, the trial court rendered a total award of $902,007.00 in favor of plaintiff and $75,000.00 in favor of Mr. Levy. The State of Louisiana, Office of Risk Management, intervenor, was awarded judgment on its intervention, in the amount of $60,848.48 for medical benefits paid, and $32,634.89, for weekly compensation indemnity benefits paid.
On appeal, defendants do not challenge liability. Instead, they contend that the trial court erred: (1) in awarding $267,195.00 in future lost wages; (2) in awarding excessive amounts for future medical expenses and maid services; (3) in allowing Lars Levy to testify as an expert on economic issues; and (4) in making a separate award for loss of enjoyment of life.

DISCUSSION

Assignments of Error Nos. One and Three (Future Lost Wages & Levy's Testimony on Economic Issues)
In these assignments, defendants contend that the trial court erred in awarding plaintiff $267,195.00 in future loss wages, arguing: (1) that none of plaintiff's physicians *973 specifically testified that she was not able to return to work or to pass the licensed professional counselor exam; (2) that plaintiff failed to call a vocational rehabilitation counselor to testify as to what work plaintiff was capable of performing; (3) that plaintiff was earning more after the accident than she earned prior to the accident; and (4) that there was no competent evidence to support an award based on earnings of $45,000.00 per year, as the trial court improperly allowed plaintiff's husband, also a plaintiff in this case, to testify as an expert witness on critical economic issues. We first consider defendants' challenge to the trial court's evidentiary ruling allowing Mr. Levy to give expert, economic testimony, as our disposition of this challenge may affect our review herein.
A plaintiff is required to prove special damages by a preponderance of the evidence, and the findings of the trier of fact are subject to the manifest error standard of review. Fleniken v. Energy Corporation, XXXX-XXXX, XXXX-XXXX, p. 29 (La. App. 1st Cir.2/16/01), 780 So.2d 1175, 1195, writs denied, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La.6/15/01), 793 So.2d 1250, 793 So.2d 1253, 793 So.2d 1254. Awards for loss of future income are intrinsically insusceptible of mathematical exactitude. Oliver v. Cal Dive International, Inc., XXXX-XXXX, p. 6 (La.App. 1st Cir.4/2/03), 844 So.2d 942, 946. Although courts are not expected to calculate such awards with mathematical certainty, they cannot be based purely on speculation, conjecture, and probabilities. Naman v. Schmidt, 541 So.2d 265, 269 (La.App. 4th Cir.1989). As such, the judiciary must exhibit sound discretion in rendering awards that are consistent with the record and do not impose a hardship upon either party. Oliver, XXXX-XXXX at p. 6, 844 So.2d at 946.
An award of loss of future income is not based upon the difference between the plaintiff's earnings before and after a disabling injury. Rather, the award is predicated upon the difference between a plaintiff's earning capacity before and after a disabling injury. Lasyone v. Kansas City Southern Railroad, XXXX-XXXX, p. 9 (La.App. 1st Cir.9/28/01), 809 So.2d 344, 350-351, writ denied, XXXX-XXXX (La.3/15/02), 811 So.2d 891.
Defendants contend that the trial court erred in allowing Mr. Levy to qualify as an expert in the field of substance abuse counseling and in accepting his "expert" testimony as to plaintiff's future lost wages. Thus, defendants contend the record does not support this award. After careful review, we agree.
Plaintiff's husband is the Administrative Director of the Drug Court Program in St. Mary Parish. Mr. Levy opined that based on his knowledge of the general field of counseling, but for the accident, his wife would have earned $75.00 per hour as a licensed professional counselor in a private practice. He testified that in his position as the administrator of the St. Mary Drug Court Program, he would have had no difficulty referring to his wife a minimum of twenty patients per week if she had become a licensed professional counselor. The trial court accepted Mr. Levy as an expert in the field of substance abuse counseling and clearly relied upon this testimony in determining the economic impactment of the accident. In doing so, the trial court stated:
The testimony of Mr. Levy qualified as an expert in this area and also from his general knowledge has testified that $45,000 per year would have easily been made by Mrs. Levy as a licensed professional counselor. Mr. Levy could have referred at least 20 hours per week *974 work to Mrs. Levy as a licensed professional counselor in Morgan City.
Defendants argue on appeal that Mr. Levy's testimony was "self-serving, extremely biased and should not have been permitted." They contend the economic testimony was improperly favorable to the plaintiffs, noting that Mr. Levy, who testified as to the hourly income and yearly income of a licensed professional counselor, was not, nor had he ever been, a licensed professional counselor. Defendants argue he had no basis for claiming expertise on such economic issues and that the trial court erred in accepting Mr. Levy's testimony.
Defendants further contend that because Dr. Randolph Rice's economic report was the sole evidence submitted by plaintiffs in support of Mrs. Levy's future lost wage claim, and the only information supplied to Dr. Rice in preparing his report was based on Mr. Levy's testimony, the court erred in rendering any award for future lost wages, on the basis of Dr. Rice's report.
Without determining the correctness of the opinions and facts set forth in Mr. Levy's testimony, we agree that it was error for the trial court to accept Mr. Levy as an expert in the field of substance abuse counseling, and to then allow him to testify as to the hourly and annual wages of licensed professional counselors. In particular, in this case where both Mr. Levy and his wife are named plaintiffs, and further, where the figures set forth in his testimony were the sole basis for the monetary awards rendered to the plaintiffs, we find merit in defendants' arguments.
While bias alone may not preclude a witness from being qualified as an expert, Mr. Levy has not shown that he possesses the relevant qualifications necessary to be an expert on this issue. See Pelts & Skins Export, Ltd. v. State, Department of Wildlife and Fisheries, 1997-2300, p. 4 (La.App. 1st Cir.4/1/99), 735 So.2d 116, 122, writs denied, 1999-2042, 1999-2036 (La.10/29/99), 748 So.2d 1167, 1168. As such, we find the trial court committed legal error in allowing Mr. Levy to testify in this capacity and then using his testimony as the basis for determining the amount of the lost future wage claim. On review, we find the court's error interdicts the fact finder's decision on this issue.
When the trial court commits legal error, which interdicts the fact finding process, the manifest error standard is not applicable. If the record is complete, the appellate court must undertake an independent de novo review of the record and determine which party or parties should prevail by a preponderance of the evidence. Ferrell v. Fireman's Fund Insurance Company, 94-1252 pp. 3-4 (La.2/20/95), 650 So.2d 742, 745. However, "a de novo review, without any deference to the fact finder, is only appropriate when there is legal error implicit in the fact finding process or when a mistake of law forecloses the fact-finding process, such as when the fact finder's decision has been tainted by an improper and prejudicial jury instruction or erroneously admitted prejudicial evidence." Clement v. Frey, 95-1119, p. 2 (La.1/16/96), 666 So.2d 607, 612 (Lemmon, J. concurring).
While we recognize that as an appellate court, we are empowered under such circumstances to conduct a de novo review, we find that given the record before us, we are unable to do so. As the defendants correctly note, the findings and opinions set forth in Dr. Rice's report were based solely on the figures and circumstances established by Mr. Levy. Dr. Rice testified that he did not perform any independent study to determine whether or not there were any jobs available in this state for a *975 licensed professional counselor, which would pay an annual salary of $45,000.00. Also, in preparing his calculations, he was instructed to assume that plaintiff could never complete the licensing procedure for a licensed professional counselor, despite the recommendations of at least one of her attending physicians, Dr. Redden, that she complete the licensing process.
Because plaintiffs presented no other evidence to establish the value, if any, of her future wage loss claim, we are unable to determine the issue on the record before us. However, in the interest of fairness to the parties, we vacate the future wage loss award rendered by the trial court and remand this matter to the trial court to allow the parties to present the necessary evidence for proper determination of the amount, if any, plaintiffs should be awarded for Mrs. Levy's claim for future lost wages.[2]
This assignment has merit.

Assignment of Error Number Two (Future Medical Expenses and Maid Services)
In this assignment, defendants contest the trial court's awards for future medical expenses and maid services. In order to recover future medical expenses, the appellate record must establish that future medical expenses will be necessary and inevitable. Richard v. St. Paul Fire and Marine Insurance Company, 94-2112, pp. 10-11 (La.App. 1st Cir.6/23/95), 657 So.2d 1087, 1093. An award for future medical expenses will not be supported in the absence of medical testimony that they are indicated and setting out probable cost. Rhodes v. State, Department of Transportation and Development, 94-1758, p. 21 (La.App. 1st Cir.12/20/96), 684 So.2d 1134, 1148, writ denied, 97-0242 (La.2/7/97), 688 So.2d 487.
Nevertheless, when the record establishes that future medical expenses will be necessary and inevitable, courts should not reject the award because the record does not provide the exact value, if the court can determine from the record, past medical expenses, and other evidence a minimum amount that reasonable minds could not disagree would be required. Stiles v. K Mart, 597 So.2d 1012, 1013 (La.1992) (per curiam); LSA-C.C.P. art. 2164.
The evidence shows that after the fall, plaintiff lost her vision for approximately two minutes and immediately developed a "knot" on her head. She was transported by ambulance to Lakewood Hospital in Morgan City, where she presented with complaints of disorientation, headache, and soreness in her neck, shoulders and right side of her back. Plaintiff also complained of tingling sensations going down her right leg, when she arrived at the emergency room. The emergency room physician conducted an examination, ordered x-rays and a urine screen, and later released plaintiff to return home with certain restrictions and limitations.
On April 1, 1999, approximately six days after the accident, plaintiff was seen by Dr. Jeffrey C. Fitter, an orthopedic surgeon. At the visit, she complained of continuous headaches, dizziness, balance problems, soreness, stiffness, and an inability to move her neck from side to side with restricted motion. Dr. Fitter performed physical and neurological examinations and reviewed the cervical, thoracic, and lumbar spine x-rays taken at the emergency room.
As a result of his examination, he concluded that plaintiff had sustained a muscular *976 injury to her neck and low back, which he classified as a cervical and lumbar strain. He further opined that, based on her symptoms, she had seemingly sustained a concussion in the accident. Dr. Fitter prescribed a mild narcotic for pain and a muscle relaxer that he advised Mrs. Levy to take with caution and only after work.
Plaintiff returned to see Dr. Fitter on April 9, 1999. On this second visit, he concluded that her symptoms had not improved and that her findings on examination were more or less unchanged. In addition to her neck and back problems, she continued to complain of dizziness and was experiencing headaches and increasing problems on the job. Based on her difficulty in tolerating a full eight-hour work schedule, Dr. Fitter recommended that she restrict her work hours to four hours per day. After plaintiff returned on April 20, 1999 and May 4, 1999 with mild improvement, but persistent complaints of headaches and dizziness, Dr. Fitter ordered a CT scan and referred her to a neurologist, Dr. Kenneth Gaddis.
Dr. Gaddis first examined plaintiff on May 10, 1999. She presented with complaints of headaches, dizziness, and lower back and neck pain. Plaintiff indicated that she first became aware of the dizziness Kwhile waiting in the emergency room, soon after her fall. She described the feeling as an intermittent sensation that would vary from lightheadedness to true vertigo. The spinning sensations were, at times, so severe that her vision would blur and she would feel like she was losing her balance or was falling. Plaintiff further described chronic daily headaches, a pressure sensation that would vary in intensity throughout the day, and problems with her short-term memory, which she related to the slip and fall.
After conducting a neurological exam, Dr. Gaddis concluded that the symptoms plaintiff was describing were consistent with post-concussion syndrome and that she also may have developed a traumatic labyrinthitis. An MRI performed May 12, 1999 reported normal findings; however, ENG Studies reported abnormal findings, supporting his diagnosis of labyrinthitis. Dr. Gaddis suggested that she seek a full evaluation by an ENT specialist, Dr. Paul Gaudet, for treatment of her complaints of loss of balance and vertigo. However, during the course of her treatment, Dr. Gaddis also recommended physical therapy, prescribed Antivert for dizziness, and prescribed Depakote, which is an anti-convulsant medication for epilepsy, that also has the benefit of reducing the frequency of migraine headaches. Plaintiff was also taking Imitrex, which was primarily used as a migraine medication.
When plaintiff was seen by Dr. Gaddis on December 2, 1999, he concluded that her labyrinthisis was back to normal; however, she continued to complain of dizziness and presented with symptoms that suggested she was suffering from depression. In May of 2000, Dr. Gaddis prescribed Effexor, an anti-depressant, in response to plaintiff's complaints. Plaintiff attributed her difficulty in taking tests and problems with her short-term memory to her use of Depakote. Thus, Gaddis tried to reduce the dosage to help improve her cognitive abilities and also tried substituting it with other medications. Plaintiff reported no success with the other medications, and returned to the Depakote.
By November of 2000, Dr. Gaddis referred plaintiff to Dr. Marsha Redden, a clinical neuropsychologist, for evaluation and management of her depression. He also recommended physical therapy to help with her walking. On plaintiff's visit of April 17, 2001, Dr. Gaddis changed her *977 anti-depressant prescription to Paxil. Dr. Gaddis recommended that plaintiff return to work in May of 2001, with the understanding that he would continue to monitor her medications periodically from that point. He testified that all of her symptoms were consistent with post-concussion syndrome and that he felt she could be on these prescribed medications to treat her symptoms for a number of years.
Plaintiff was seen by Dr. Gaudet, a specialist in the field of otolaryngology, on May 25, 1999, upon referral by Dr. Gaddis. Upon examination, Dr. Gaudet's impression was that plaintiff had damaged the utricle or saccule of her inner ear in connection with the fall. Until the problem was corrected surgically, he recommended that due to her complaints of dizziness, she not drive or climb, and further recommended that she receive treatment from Dr. James Soileau, who practices in the field of otolaryngology, but specializes in ear and vestibular problems.
Dr. Soileau's testing revealed a 37% reduced function of her right side, and problems with lower frequencies on her right side. Dr. Soileau opined that the inner ear crystals in plaintiff's inner ear chambers had been repositioned by the fall, and that plaintiff would be relieved of some of her complaints of dizziness and vertigo problems if the crystals were positioned back in place. He performed the first surgery on Mrs. Levy's right ear on August 18, 1999. Surgery was performed on her left ear on September 15, 1999. After the surgeries, Dr. Soileau determined that the crystals were in place and in normal position. Because plaintiff complained of recurring dizziness and balance problems, Dr. Soileau referred her to his partner, Dr. Gerald Gianoli, a neurotologist who specialized in ear-related problems.
Dr. Gianoli eventually confirmed his diagnosis of (1) benign paroxysmal positional vertigo; and (2) a right perilymphatic fistula, which would account for her complaints and symptoms. On March 7, 2001, Dr. Gianoli performed a third surgery, to repair the fistula tear at North Oaks Hospital. The surgery was performed under general anesthesia, after which he discharged plaintiff with instructions that she restrict her activities to five days of bed rest, six weeks of prolonged rest, to avoid any strenuous activity, and that she engage in a prescribed routine of eye exercises. Dr. Gianoli classified the surgery as an overall success and noted that plaintiff's post-surgery visits revealed significant improvement, with her dizziness improving 80-85%. Dr. Gianoli recommended that plaintiff increase her activities back to a normal activity level with a continued regimen of exercise to improve her gait and walking. At the second post-operative visit, he recommended that she return to work under these restrictions.
On December 13, 2000, plaintiff began treatment with Dr. Redden, upon referral from Dr. Gaddis, for depression. She continued in treatment with Dr. Redden through the date of trial. Dr. Redden testified that plaintiff seemed to do better in dealing with the anxiety component of the depression while on Paxil, and thought she was actually in a "mourning" stage rather than a true "depression," in terms of dealing with her limitations. Dr. Redden recommended that plaintiff speak to her employer about limiting her hours to 20-25 hours per week, with a corresponding cut in pay. Dr. Redden made these recommendations in response to plaintiff's complaints that by Thursday of an average work week she was so stressed and fatigued that she could hardly function. Dr. Redden also recommended that plaintiff obtain her licensed professional counselor certification. She testified that as a licensed professional counselor, plaintiff *978 would have greater flexibility and independence in her schedule and employment options, suggesting that plaintiff could open a private practice and would have a greater chance of finding part-time employment.
Considering the above medical testimony, we address each challenged award separately, as raised in brief by defendants.[3]

A. Depakote/Imitrex
Based on a monthly cost of $56.68 for Depakote and $158.80 for Imitrex, the trial court awarded plaintiffs the sum of $30,124.00 for Depakote and $84,399.00 for Imitrex for the remainder of plaintiff's life expectancy of 44.29 years.[4]
Dr. Gaddis prescribed Depakote and Imitrex, to reduce the frequency of plaintiff's migraine headaches. According to Dr. Gaddis' medical records, plaintiff reported that when she had tried to stop taking the Depakote, her headaches became more frequent and more intense. Dr. Gaddis testified that he did not see any point in stopping the medications and stated that plaintiff may be on the medications for a number of years. Dr. Gaddis further testified that 30% of patients with post-concussion syndrome have some permanent residual neurological deficits. Inasmuch as several years had already passed since the accident, and plaintiff was still presenting with symptoms consistent with post-concussion syndrome, Dr. Gaddis anticipated these medications would be fairly permanent medication for her, as she could reasonably expect to present with symptoms in the foreseeable future and possibly for the rest of her life. Based on this testimony, the trial court concluded plaintiff will need medication indefinitely in order to help with the headaches.
Given Dr. Gaddis' testimony, we are unable to say the trial court manifestly erred in drawing this conclusion and in awarding plaintiff the cost of the Depakote and Imitrex.

B. Paxil
Plaintiff was also taking Paxil, an anti-depressant medication, which cost $88.98 each month. Using the same method of calculation, the trial court's award included $47,291.00 for plaintiff's use of Paxil over the course of her life. Dr. Redden testified that she had seen some improvement in plaintiff since she began on Paxil in March 2002 and that she expected more improvement from plaintiff in dealing with her anxiety, barring any other unforeseen trauma. She expected that as plaintiff moved on, put the LPC exam behind her, and established job stability, she would hope for improvement.
However, Dr. Gaddis testified that plaintiff could expect to continue with the symptoms associated with post-concussion syndrome for the rest of her life.
Considering this testimony and the record in its entirety, we likewise find no error in the trial court's inclusion of future expenses for Paxil in its award to plaintiff.

C. TENS Unit
Upon plaintiff's discharge, Dr. Fitter prescribed a TENS unit to enable plaintiff to give herself portable treatments *979 for pain in her lower back, shoulder blades, and neck. The unit was able to be clipped on plaintiff's belt and used throughout the day. Plaintiff testified that she wore the unit on a regular basis, and used it two or three days during the week, in the evenings during the week, and virtually all weekend. Dr. Fitter testified that the unit could be used indefinitely, and that he expected she would need it for quite a while. Moreover, Dr. Fitter's medical diagnosis was that she suffered chronic cervical and lumbar strain muscle injuries which had passed into the long term stage. The supplies that accompany the unit, including electrodes and skin cream, cost $207.53 each month. Using this figure, the trial court awarded plaintiff $55,149.00, representing the cost of use of the unit and supplies over the course of plaintiff's life. Based on the testimony, the trial court concluded that plaintiff's neck and back problems were chronic.
Considering this testimony and the record herein, we also find no error in this award.

D. Lab Tests/Office Visits
Dr. Gaddis testified that in order to continue on Depakote, plaintiff's blood count would require monitoring, and blood work would be necessary to check her liver function three or four times a year. He testified that she would have to be seen by a physician a minimum of three times per year to refill the medications. Calculating the lab cost for 3.5 times per year, based on $122.00 per test, the trial court awarded plaintiff $18,911.83 representing the costs of such testing over the course of plaintiff's life. The trial court also awarded costs for a minimum of three office visits a year with Dr. Gaddis, as required in monitoring her medication. Using a cost of $105.00 per visit, the trial court's award was $13,951.00.
On review, considering the medical testimony herein, establishing that future regular office visits and lab work will be necessary, we again find no manifest error in the trial court's award for these medical expenses.

E. Maid Services
Plaintiff testified that prior to the accident, she employed a maid to come into her home and perform cleaning services at a cost of $40.00 per service, every other week. Plaintiff contended that since the accident, she has been unable to perform tasks such as cooking, washing and drying laundry, ironing, and folding clothes, and putting clothes away. She testified that after the accident, she increased the frequency of those services to a weekly basis at an increased cost of $65.00 every week. Based on her weekly housekeeping expenses, the trial court awarded plaintiff $56,936.00 for maid services over the course of her lifetime, again utilizing a lifetime expectancy of 44.29 years.
Louisiana law allows, as an element of damages, reasonable housekeeping expenses necessitated by the incapacity of an injured spouse. Prevost v. Cowan, 431 So.2d 1063, 1068 (La.App. 1st Cir.1983). However, this award has been rejected in cases where the plaintiff employed a housekeeper prior to the accident or injury, and the evidence failed to show that plaintiff would be unable to perform substantially all of the usual household duties of a homemaker. See Prevost and Odom v. Claiborne Electric Cooperative, Inc., 623 So.2d 217 (La.App. 1st Cir.1993), writ denied, 93-2464 (La.12/20/93), 629 So.2d 1171.
In Prevost, although the thirty-year-old plaintiff was released to return to her customary employment after suffering a concussion in an auto accident, she likewise *980 continued to suffer from headaches, anxiety, irregular sleep patterns, difficulty in focusing or concentrating on any one thing for any length of time, and depression for which she sought treatment. On appeal, this court affirmed the jury's decision denying damages for such housekeeping expenses, as the testimony showed that it was customary for plaintiff to employ a housekeeper and that plaintiff, in fact, had employed a housekeeper prior to the accident.
Additionally, we find the record herein is void of any evidence or expert medical testimony to show that plaintiff will require maid services for the remainder of her life. Noteably, each of plaintiff's physicians testified that she is able to return to work. Although plaintiff remains "depressed" and testified that she gets tired after working all week, there was no medical testimony presented to show that plaintiff is physically incapable or incapacitated from such duties, nor is there evidence establishing the need for weekly maid services. Because we find no adequate basis in the record to support an award for maid services for the remainder of plaintiff's life, we vacate this portion of the judgment.
Thus, we affirm the awards for future medical expenses and reverse the portion of the judgment awarding maid services.

Assignment of Error Number Four (Separate Award for Loss of Enjoyment of Life)
The trial court awarded plaintiff $50,000.00 for loss of enjoyment of life citing plaintiff's inability to continue to roller skate,[5] difficulty in flying in airplanes, difficulty in having (and enjoying) sexual relations with her husband, inability to accomplish her goal of becoming a licensed professional counselor, and loss of independence and ability to maintain the high level of activity she enjoyed prior to the accident.
Citing jurisprudence from the Fourth Circuit Court of Appeal in support of their position, defendants argue that the award for loss of enjoyment of life is duplicative. Defendants further argue that the award is not supported by the record, as it is based in large part on the erroneous belief that plaintiff will never become a licensed professional counselor, which defendants contend is uncertain.
Under the facts presented herein, we note that this court has consistently recognized an award for loss of enjoyment of life as a separate and independent item of damages from physical pain and suffering. For discussion and comparison with other appellate courts, see Matos v. Clarendon National Insurance Company, 2000-2814, pp. 8-9 (La.App. 1st Cir.2/15/02), 808 So.2d 841, 847-848. Moreover, on review of the record, the award clearly was based on multiple factors, and was not contingent on merely plaintiff's ability or inability to become a licensed professional counselor.
As such, we find no error in the trial court's rendition of an award for loss of enjoyment of life as a separate item of damages, nor do we find the award to be manifestly erroneous.
This assignment also lacks merit.

CONCLUSION
For the above and foregoing reasons, we reverse the portion of the July 18, 2002 judgment of the trial court awarding $56,936.00 for maid services, and vacate the portion of the judgment awarding plaintiff $267,195.00 in future lost wages. We remand the matter to the trial court for consideration of this claim and for further *981 proceedings consistent with the views expressed in this opinion. In all other respects, the judgment is affirmed.
Costs of this appeal are assessed against the defendants, Bayou Industrial Maintenance Services, Inc. and Transcontinental Insurance Company.
REVERSED IN PART; AFFIRMED IN PART; VACATED IN PART AND REMANDED.
McDONALD, J., concurs.
NOTES
[1] Defendants were also cast with costs of $6,600.81 and legal interest.
[2] Finding merit to this argument, we pretermit consideration of defendants' other challenges to the trial court's award for future loss wages.
[3] For brevity, we have not delineated the other aspects of plaintiff's injuries giving rise to past medical expenses in the amount of $64,079.43.
[4] In arriving at each award, the trial court calculated the monthly cost of each medication, multiplied by 12 months to arrive at a yearly cost, then multiplied the yearly cost by 44.29 years, which was life expectancy suggested by Dr. Rice.
[5] The testimony showed that prior to the accident, plaintiff was an avid roller skater.