971 So.2d 1084 (2007)
Larry and Rosie ADAMS
v.
RHODIA, INC. and Exxon Mobil Corporation.
No. 2006 CA 1803.
Court of Appeal of Louisiana, First Circuit.
September 26, 2007.
Aidan C. Reynolds, Christopher L. Whittington, Baton Rouge, LA, for Plaintiff/Appellee, Larry Adams.
L. Victor Gregoire, Melissa A. Hemmans, Baton Rouge, LA, Michael P. Cash, Pro Hac Vice, Houston, TX, for Defendant/Appellant, Exxon Mobil Corporation.
Before CARTER, C.J., KUHN, PARRO, GUIDRY, and McCLENDON, JJ.
McCLENDON, J.
In this personal injury suit, Exxon Mobil Corporation (Exxon), the only remaining *1086 defendant at trial, appeals the judgment for damages in favor of the plaintiff, Larry Adams. After a thorough review of the record, we reverse.

FACTS AND PROCEDURAL BACKGROUND
By contract, Mr. Adams' employer, Rhodia, Inc. (Rhodia), provided sulfuric acid to Exxon for use at its facility. After the acid was used, Exxon returned the spent acid to Rhodia through a pipeline for regeneration of the acid for future use by Exxon and other Rhodia customers. At Rhodia, the acid was often stored in tanks, and sometimes held in rail cars.
On May 14, 2000, Mr. Kenneth Fontenot, another employee of Rhodia, was attempting to pump spent sulfuric acid from Rhodia's Tank 10 onto a barge. During the unloading procedure, he noticed that Tank 10, which was dedicated to receiving spent sulfuric acid from Exxon, showed an unusually rapid and high rise in temperature of 120 degrees.[1] In compliance with company protocol, Mr. Fontenot "blocked" off the tank by shutting off all valves to the tank, including intake and outtake. Mr. Fontenot then noted the incident in the log and told the shift supervisor. According to Mr. Fontenot, normal procedure would also require the tank to remain blocked off until an explanation could be found for such an increase in temperature.
The next morning, on May 15, 2000, plaintiff, Mr. Larry Adams, relieved Mr. Fontenot some time between 5:30 a.m. and 6:00 a.m. Mr. Fontenot told Mr. Adams of the rise in temperature. Despite the normal procedure to first determine the cause of the sudden temperature rise before unloading resumed, Rhodia ordered Mr. Adams to transfer the spent acid from Tanks 7 and 10 onto the barge. As soon as Mr. Adams opened the Tank 10 valve to unload the spent acid onto the barge, an alarm sounded. After checking the gauge in the tank farm control room, he noticed a spike in temperature. Following the same procedure as Mr. Fontenot had the night before, Mr. Adams electronically stopped the unloading of the tank from the control room, and then went outside to block off the tank by manually shutting off the valve. When Mr. Adams began to block off Tank 10, sulfur dioxide gas was released from the tank. The release occurred about 10:16 a.m. Mr. Adams suffered severe injuries from his exposure to the gas.
On May 8, 2001, Mr. Adams and his wife, Rosie, filed a petition for damages, naming as defendants Rhodia and Exxon. By the time of trial, Mr. Adams had settled with Rhodia. Rhodia, various additional defendants named by amending and supplemental petitions, and an intervening insurer were eventually dismissed from the suit.
At the jury trial, plaintiff primarily relied on the testimony of a chemical engineer, Dr. Steanson Parks, who was accepted as an expert. In Dr. Parks' opinion, Exxon released free or insoluble hydrocarbons into the pipeline sometime between 6:30 a.m. and 6:50 a.m. on May 15, 2000, the morning of the accidental gas release. An insoluble hydrocarbon load, for example, jet fuel, posed a threat when combined with the acid and was not a material that should have been released into the pipeline and sent to Rhodia. According to Dr. Parks' estimate, it would take approximately 40 minutes for an insoluble hydrocarbon load to reach the Rhodia facility. Based on an assumption that Tank 10 must have opened to intake material from *1087 the pipeline at around 6:30 a.m. on the morning of the accident, Dr. Parks theorized that the insoluble hydrocarbon load entered Tank 10 at that time. In his opinion, the combination of the free or insoluble hydrocarbon and the spent sulfuric acid triggered an exothermic reaction that led to the gas release. Dr. Parks believed that the introduction of insoluble hydrocarbon from an Exxon unit into the pipeline was evidenced by a twenty plus degree rise in temperature, recorded by the Exxon unit at the time it was sending material to Rhodia, and by the post-accident finding of a half inch coating of visible, insoluble hydrocarbon on the surface of the remaining material in Tank 10.
However, on cross-examination, Dr. Parks was advised by Exxon's counsel that the tank had been blocked off the night before and was opened only for unloading of the material just prior to the gas release at 10:16 a.m. In response, Dr. Parks admitted that he had no evidence that a hydrocarbon load entered Tank 10 and he had no other explanation for how a load of hydrocarbon could have entered the tank on the morning of the accident. On rebuttal, Dr. Parks agreed with the plaintiff's counsel assertion that, regardless of when the free or insoluble hydrocarbon from Exxon got into the tank, the presence of insoluble hydrocarbon in the tank after the accident proved their theory linking Exxon to the gas release. Thus, it was the theory that plaintiff's relied on to establish fault on the part of Exxon.
A representative of Rhodia, who was called by plaintiff, related the findings of Rhodia's post-accident investigation. Admittedly, Rhodia took a stream of spent acid, which had been stored in a rail car, and blended it with the spent acid material already in Tank 10. The two streams of spent acid had different chemical compositions and should not have been mixed. The two different streams were then allowed to react with each other while sitting in the tank for weeks; a process that produced a higher percentage than usual of sulfur dioxide gas. According to Rhodia, the unloading procedure agitated the combined streams enough to cause the sudden release of the confined sulfur dioxide gas that injured Mr. Adams. Rhodia found no evidence that an insoluble hydrocarbon load from Exxon played any role in the 2000 accident and injury to Mr. Adams.
Dr. Kerry Dooley was called by Exxon and accepted as an expert in chemical engineering. Dr. Dooley agreed with Rhodia that hydrocarbon played no part in the accident. He testified that spent acid generally contains about eight to nine percent soluble hydrocarbon, called acid soluble oils or "aso." According to Dr. Dooley, while the streams of spent acid were sitting for weeks in Tank 10, the "aso" and spent acid reacted, as indicated by the build-up in temperature. As a result of the reaction, sulfur dioxide gas was produced and built up in the tank. When the unloading procedure began, the material was agitated and the gas was released suddenly. The tank's venting capacity was overwhelmed, which allowed the explosive release of gas that injured Mr. Adams. If the material in the tank had been agitated every few days, the gas would have been released and vented gradually. Another byproduct of the reaction was the light, insoluble hydrocarbon that floated to the surface of the tank. In Dr. Dooley's opinion, the amount of insoluble hydrocarbon measured in Tank 10 after the accident was "entirely consistent" with such a reaction during the three to four week period the material sat in Tank 10 before the unloading procedure began.
It was undisputed that the insoluble hydrocarbon found in Tank 10 post-accident *1088 was not analyzed by either party. Therefore, it was not determined through testing whether the insoluble hydrocarbon seen in the tank post-accident was a byproduct of the spent acid and "aso" reaction, or part of a free or insoluble hydrocarbon load from Exxon, such as jet fuel.
After the jury retired, a question was forwarded to the trial judge. The jury asked, "If one hundred percent of fault was on Rhodia, would all the compensation come from Rhodia?" Counsel for both sides argued as to how the question should be answered. Plaintiffs believed that the answer was no; Rhodia had settled and was no longer a party, thus no additional payment would come from Rhodia. Exxon believed that the answer was yes, and argued that if only Rhodia was at fault for the accident, the settlement payment made by Rhodia would be the total compensation paid to Mr. Adams. After the exchange, the court addressed the jury, as follows:
The Court:
The question is not susceptible to being answered yes or no and requires a further explanation. Be instructed that fault may be allocated amongst and against any person. Compensation will come from a party. Everybody understand?
[Jury Foreperson]:
No, Ma'am.
The Court:
All right. Fault or negligence can be allocated against any person. A person may be an individual or a corporation or a partnership. They can be persons and divided into fault.
Compensation, however, would come from a party in the litigation. A party is different from a person. A person may be a party. In this litigation there are two parties. You understand? Sort of?
[Juror]:
One more time.
The Court:
You have two concepts you're talking about here, fault and compensation. Fault may be allocated, allocated means spread among, any person, any persons, involved in any way. You can spread fault. Compensation, on the other hand, comes from a party. A party is a member of the action, the lawsuit. Does that amplify it for you? Everybody understand?
[Juror]:
So, your honor, are you saying our wording is off when we asked the question?
The Court:
You will recall that the court suggested to you that all persons are equal before the court, persons. A corporation is a person. I explained that to you. All right?
A party, however, the court did not instruct you on who is a party. A party is a litigant, a party to the action.
[Jury Foreperson]:
We do have one question too that we left in there.
The Court:
All right. What is your question?
[Jury Foreperson]:
There was a breakdown, a financial breakdown sheet, and on there at the top it was Mr. Larry Adams versus Rhodia slash Exxonmobil. I think that sort of  we know it's Exxonmobil but on that sheet it did say Rhodia slash Exxon.
The Court:
Well, that was the style of the case initially. The style means that was the denomination of the case in the very beginning.

*1089 . . .
[Juror]:
Your Honor, could I ask how many parties are involved in this case, numbers?
The Court:
Well, of course you can. You will recall that the court read to you the contentions of the parties. The court read to you the plaintiffs' contentions and defendant's contentions. Do you recall?
[Juror]:
Yes, Ma'am.
The Court:
All right. So you know the answer, right? Plaintiffs, defendants.
After the exchange ended, Exxon objected to the court's giving an instruction that had not been agreed to by the parties and argued that the instruction given led "the jury to believe that if they do not find Exxonmobil responsible, that there will be no compensation for Mr. Adams." The court denied the objection.
After trial, the jury rendered a verdict in favor of the plaintiffs. Specifically, the jury assigned two percent of the fault to Mr. Adams, ten percent to Exxon, and eighty-eight percent to Rhodia; and, awarded a total of $4,461,000.00 in damages. A judgment incorporating the verdict was signed on March 27, 2006.
Exxon filed a motion for remittitur and a judgment notwithstanding the verdict, both of which were denied. Exxon appealed. Plaintiff answered the appeal requesting an increase in the fault assigned to Exxon.

APPLICABLE LEGAL PRECEPTS
When there is legal error implicit in the fact-finding process or when a mistake of law forecloses the fact-finding process, such as when the factfinder's decision has been tainted by an improper and prejudicial jury instruction or erroneously admitted prejudicial evidence, a de novo review may be appropriate. State Farm Mutual Automobile Insurance Company v. Ford Motor Company, XXXX-XXXX, p. 5 (La.App. 1 Cir. 6/15/05), 925 So.2d 1, 4; Levy v. Bayou Industrial Maintenance Services, Inc., XXXX-XXXX, p. 7 (La.App. 1 Cir. 9/26/03), 855 So.2d 968, 974, writs denied, XXXX-XXXX (La.2/6/04), 865 So.2d 724 and XXXX-XXXX (La.2/6/04), 865 So.2d 727. A de novo review, rather than a remand, is conducted only when the appellate court has all of the facts before it. Ferrell v. Fireman's Fund Insurance Co., 94-1252, p. 7(La.2/20/95), 650 So.2d 742, 747; Levy, XXXX-XXXX at p. 7, 855 So.2d at 974.

ANALYSIS
The record before us is complete. From our review of the exchange between the court, the parties, and the jury, especially in light of the actual wording of the question presented to the trial court by the jury, it is more likely than not that the jury was misled by the instructions given by the court and assumed that a finding of no fault on the part of Exxon would result in no recovery by Mr. Adams from anyone, whether party or person. See Jones v. St. Francis Cabrini Hospital, 94-2217, p. 7 (La.4/10/95), 652 So.2d 1331, 1335.
Although the jury used the word "compensation," it is apparent from the exchange with the court that the jury was not using the word in the same strict legal sense inferred by the trial court's answer, that is, as a payment ordered by a court. The jury should have been instructed not to concern itself with how Mr. Adams would actually be paid or compensated for his injury. Rather, the jury's only responsibility was to fairly assign fault and award *1090 damages based on the evidence presented to them at trial. Considering all these factors as a whole, we conclude that the instructions likely misled the jury on a crucial point, thus interdicting the fact-finding process and tainting the verdict. Therefore, no weight should be accorded the jury verdict, and we will review the record de novo. See Jones, 94-2217 at p. 7, 652 So.2d at 1335.
Based on a thorough de novo review of the record before us, we find that the plaintiff did not meet his burden to show that Exxon caused the accident and injury. The record did not support plaintiff's theory that a hydrocarbon load entered Tank 10 on the morning of the accident. Tank 10 showed an unusually high increase in temperature the night before the alleged release by Exxon of an insoluble hydrocarbon load and before the accident. At that time, Mr. Fontenot blocked off the tank. There is no evidence, testimonial or documentary, that the tank was opened for intake from the pipeline at any time on the morning of the accident. The only testimony concerning opening the tank the next morning came from Mr. Adams. He testified that the tank was opened for unloading, which would allow a flow of material out of the tank, not into the tank.
Nor is there any evidence in the record proving the release of an insoluble hydrocarbon load from Exxon to Rhodia at any time before the accident. Exxon did present evidence explaining the presence of a hydrocarbon sheen on the surface of the material in the tank post-accident. In addition, the record contains Rhodia's finding that an insoluble hydrocarbon load from Exxon played no part in the accident and that the gas release was caused by Rhodia's decision to improperly mix and unload two incompatible streams of spent acid after a long period of stagnation. After Exxon rested, plaintiff presented no rebuttal evidence to show that Exxon's expert and other evidence was incorrect, or that Rhodia's investigative findings were unreasonable or unfounded.
Alternatively, even if the jury verdict was not tainted, we would reverse. The jury's finding that plaintiff proved the requisite causal link between Exxon and the gas release was clearly wrong and not supported by the record on appeal. See Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
Because plaintiff was not able to show specifically how or when a load of insoluble hydrocarbon from Exxon entered Tank 10, which was the linchpin of his causation theory, plaintiff asserted that the mere presence of one-half inch of light hydrocarbon found after the accident in a tank dedicated to receiving Exxon materials, was sufficient to prove a causal link to Exxon. Exxon, however, provided a fundamentally unrebutted explanation as to how the amount of light hydrocarbon sheen on top of the remaining material in the tank most likely occurred. Exxon's evidence, coupled with Rhodia's internal investigation and conclusions, overwhelmed plaintiff's reliance on the mere presence of a hydrocarbon sheen observed post-accident as the only proof that a hydrocarbon load from Exxon entered Tank 10 and caused the accident. Essentially, the plaintiff was left with too many unproven assumptions. Despite the seriousness of Mr. Adams' injuries, justice is not served by imposing damages on a party in the absence of proven fault.
Having found that plaintiff failed to meet his burden of proof, we reverse the judgment and dismiss plaintiff's suit against Exxon. Costs of the appeal are assessed to the plaintiff, Larry Adams.
REVERSED AND RENDERED.
*1091 CARTER, C.J., dissents.
GUIDRY, J., dissents and assigns reasons.
GUIDRY, J., dissenting.
I respectfully dissent from the majority's opinion, reversing the trial court and dismissing the plaintiffs' claims against Exxon. First, I do not agree that the trial judge's instructions misled the jury such that the jury verdict was tainted. In a jury trial, the judge has a duty to give instructions, which properly reflect the law applicable in the case. La. C.C.P. art. 1792. In making his charge to the jury, a trial judge is not required to give the precise instructions submitted by either party, but must give instructions which properly reflect the law applicable in light of the facts of the particular case. LaFrance v. Bourgeois, 97-376, p. 4 (La.App. 5th Cir.10/15/97), 701 So.2d 1026, 1029, writ denied, 97-2865 (La.2/13/98), 706 So.2d 995. Further, the law is clear that an appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 (La.App. 1st Cir.3/11/94), 634 So.2d 466, 488, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094.
In the instant case, the jury instructions given by the trial judge correctly pointed out that fault may be assessed against any person, but compensation, or an award for damages, can only come from a party to the action. There is no evidence in the record that this legally correct instruction prejudiced Exxon. In fact, the jury returned a verdict finding Rhodia, who was no longer a party to the action, eighty-eight percent at fault, and only assessed Exxon with ten percent of fault. Accordingly, because the jury instructions accurately reflect the law applicable to the issue posed by the jury, and there is no evidence in the record that these instructions misled the jury in its determination of fault, I find that a de novo review of the record is inappropriate.
Further, reviewing the record in its entirety, and applying the manifest error/clearly wrong standard, I find that there is a reasonable factual basis in the record to support the jury's decision to find Exxon ten percent at fault for the accident at issue. Plaintiffs' expert, Dr. Parks, testified that the Light Oil Finishing Unit (LOFU) at Exxon, which primarily treats substances such as jet fuel and uses hydrocarbons in the reactive process, sends spent sulfuric acid directly from LOFU through an exclusive pipeline system to Rhodia, without any intermediate storage. Dr. Parks stated that he analyzed a few months of data from LOFU and saw several spikes in temperature prior to the spike on the morning of the accident. According to Dr. Parks, free hydrocarbon entered the pipeline and was transferred from Exxon to Rhodia with the spent sulfuric acid, as evidenced by the spike in temperature on the morning of the accident and the film of light hydrocarbon on the top of the acid in tank ten.
Though Dr. Parks' testimony was called into question, because the pipeline to tank ten had been closed by Rhodia the night prior to the accident following a similar unexplained and uninvestigated spike in temperature, Dr. Parks gave additional testimony to support his theory that free hydrocarbon contaminated the spent sulfuric acid in tank ten. Dr. Parks stated Exxon acknowledged some soluble hydrocarbon traveled with the spent sulfuric acid through the pipeline, which was permissible; however, there was no material safety data sheet for LOFU, and the material safety data sheet referencing the spent sulfuric acid transported to Rhodia did not *1092 indicate the type of hydrocarbon that was sent with the spent sulfuric acid, or its reactive status. Also, Dr. Parks stated that due to the fact that the tanks at Exxon and Rhodia were only tested approximately twice a day, there was a gap in time in which impurities could have entered the process. Finally, Dr. Parks asserted that a couple of weeks prior to the accident at issue, foreign hydrocarbons from Exxon had entered the pipeline and were transferred to Rhodia. Based on all of this evidence, Dr. Parks opined that Exxon sent acid contaminated with free hydrocarbons to Rhodia, and but for Exxon's actions, Adams would not have been exposed to fumes.
Accordingly, from my review of the record, Dr. Parks presented the jury with a reasonable factual basis to support his opinion as to how the chemical reaction that led to Adams' injury occurred, and I do not find that the jury was manifestly erroneous in assessing Exxon with ten percent of fault in this case. Therefore, I respectfully dissent from the majority's opinion.
NOTES
[1] Although temperature rises in the chemical storage tanks were not uncommon, it was the quickness of the rise that concerned Mr. Fontenot.