993 So.2d 749 (2008)
Shad Everett JENKINS and Jennifer Ann Casanova Jenkins, Individually, and on Behalf of their Minor Children, Dillon Shad Jenkins, Baleigh Victoria Jenkins, and their Two Unborn Sons
v.
STATE of Louisiana, through The DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Town of Franklinton, Louisiana, The Franklinton Police Department, and Clarendon Insurance Company.
No. 2006 CA 1804.
Court of Appeal of Louisiana, First Circuit.
August 19, 2008.
Rehearing Denied September 25, 2008.
*754 Ronnie G. Penton, Bogalusa, Louisiana, for Plaintiffs/Appellees, Shad Everett Jenkins and Jennifer Ann Casanova Jenkins.
Charles C. Foti, Jr., Attorney General by William S. Culver, Jr., New Orleans, Louisiana, for Defendant/Appellant, State of Louisiana, through The Department of Transportation and Development.
Before KUHN, GAIDRY, and WELCH, JJ.
GAIDRY, J.
The State of Louisiana, through the Louisiana Department of Transportation and Development (DOTD), appeals a judgment on a jury verdict, finding it liable to the plaintiffs, Shad E. Jenkins and Jennifer C. Jenkins, for damages resulting from a motor vehicle accident on a state highway. For the following reasons, we reverse and amend the judgment in part and affirm it in all other respects.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
This action arises from a motor vehicle accident that occurred on December 23, 2003 on Louisiana State Highway 25 in Washington Parish. Earlier that day, another accident had occurred in the same general vicinity. A pickup truck traveling *755 southbound slid off the roadway during inclement weather, striking a residential fence and a utility pole. The collision with the utility pole caused a power line to sag over the roadway, and shortly thereafter a southbound tractor-trailer unit's windshield and side mirror struck the power line.
Because the Washington Parish sheriff's office did not at the time have any available unit to assist in responding to the single-vehicle accident, it requested assistance from the Franklinton police department. The plaintiff, Shad E. Jenkins, a self-employed lawncare business owner, was a volunteer reserve police officer for the Town of Franklinton at the time of the accident. He was accompanying Officer Chad Dorsett, a regular officer, on routine patrol when they received the radio call from the sheriff's office requesting assistance.
Officer Dorsett proceeded toward the accident location. When the unit left the incorporated limits of Franklinton, it was travelling at a speed of about 55-60 miles per hour in a heavy rain, with its emergency lights and siren activated. The posted speed limit at the accident location was 55 miles per hour. As the police unit approached the location, it hydroplaned and slid across the center line, entering the opposite lane where it collided with the tractor-trailer, which was traveling at approximately 25 miles per hour. As the result of the accident, Mr. Jenkins was rendered unconscious and sustained serious head injuries.
The police unit occupied by Officer Dorsett and Mr. Jenkins, Unit No. 6, had been previously damaged and declared a total loss in 2002, but the Town of Franklinton had repurchased the unit from an insurer and placed it back into service after having some repairs made. Those repairs, however, did not include replacement of the unit's airbags. Additionally, three of its tires were in poor condition on the date of the accident, prompting Officer Dorsett to prepare and file a maintenance report that morning.
On February 2, 2004, the plaintiffs, Shad E. Jenkins and Jennifer C. Jenkins, filed a petition for damages, naming as defendants DOTD, the Town of Franklinton, the Franklinton police department, and Clarendon America Insurance Company, in its capacity as the liability insurer of the Franklinton Police Department. In their petition, the plaintiffs alleged that the accident was caused through the negligence and fault of DOTD and the Town of Franklinton, including its police department. The plaintiffs claimed damages for themselves, on behalf of their two minor children, and on behalf of their unborn twin sons.[1]
DOTD answered the petition, denying its liability and alleging the fault of Officer Dorsett and Mr. Jenkins's contributory negligence, as well as the defense of third-party fault. The plaintiffs subsequently compromised and dismissed their causes of action against the Town of Franklinton, the Franklinton police department, and Clarendon America Insurance Company, reserving their rights against DOTD. DOTD filed an amended answer, reiterating its allegations of Mr. Jenkins's contributory negligence and third-party negligence and fault.
The case was tried before a jury on March 20-23, 2006. The jury returned a verdict finding DOTD 90% at fault and Officer Dorsett and the Franklinton police *756 department 10% at fault. The jury made the following awards of damages to Mr. Jenkins individually:

General Damages: $3,000,000.00;
Past Medical Expenses: $ 121,407.17;
Future Medical Expenses: $1,313,047.00;
Past Wage Loss: $ 85,000.00;
Future Wage Loss: $5,622,262.00;
Loss of Household Services: $ 87,215.00.

The jury additionally awarded Ms. Jenkins $250,000.00 for loss of consortium and $100,000.00 each for the minor children's loss of parental consortium. Thus, the total of all damage awards made by the jury amounted to $10,878,931.17.
The trial court's judgment based upon the jury's verdict was signed on April 13, 2006. In its judgment, the trial court first reduced Mr. Jenkins's general damages award to $500,000.00, based upon the statutory limitation of liability of La. R.S. 13:5106(B)(1), and then deducted the 10% liability assessed to the released tortfeasors from the revised total amount of damages of $8,378,931.17. It thereupon cast DOTD in judgment for the net sum of $7,541,038.05, without individual itemization of each damages award.[2]

ASSIGNMENTS OF ERROR
We summarize DOTD's assignments of error as follows:
(1) The trial court erred in denying DOTD's motion for a directed verdict.
(2) The jury erred in finding DOTD liable, or, in the alternative, in apportioning 90% of the fault to DOTD and only 10% to the Franklinton Police Department.
(3) The jury abused its discretion in its awards to Mr. Jenkins of general damages, future medical expenses, past wage loss, future wage loss, and loss of household services, and in its awards for loss of consortium to Ms. Jenkins and the plaintiffs' children.

ANALYSIS

Motion for Directed Verdict
A motion for a directed verdict in a jury trial is authorized by La. C.C.P. art. 1810, and provides that such a motion must be made at the close of the evidence offered by the moving party's opponent. Generally, a motion for directed verdict is appropriately granted when, after considering all evidentiary inferences in the light most favorable to the opponent, it is clear that the facts and inferences are so overwhelmingly in support of the moving party that reasonable jurors could not arrive at a contrary verdict. Rabalais v. St Tammany Parish School Bd., 06-0045, 06-0046, p. 6 (La.App. 1st Cir.11/3/06), 950 So.2d 765, 769, writ denied, 06-2821 (La.1/26/07), 948 So.2d 177. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. Id. A *757 trial court has much discretion in determining whether to grant a motion for a directed verdict. Id. On appeal, the standard of review of the determination of a motion for directed verdict is de novo. See Rabalais, 06-0045 at p. 7, 950 So.2d at 770.
Based upon our de novo review of the evidence presented by the plaintiffs, detailed in our discussion of the other assignments of error, we conclude that there was sufficient evidence presented in the plaintiffs' case-in-chief to justify the trial court's denial of DOTD's motion. DOTD's assignment of error on that point has no merit, and we affirm the trial court's ruling.

Fault and Liability Issues
Louisiana Civil Code articles 2315 and 2316 are the codal foundation for delictual liability for negligence in our state. Louisiana Civil Code articles 2317 and 2317.1 define the basis for delictual liability for defective things. Article 2317.1 provides that the owner or legal custodian of a defective thing causing injury or damage is liable "only upon a showing that he knew or, in the exercise of reasonable care, should have known of [the defect], that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care." Louisiana Revised Statutes 9:2800 further circumscribes the liability of public entities, including DOTD, under La. C.C. arts. 2317 and 2317.1. Hager v. State ex rel. Dep't of Transp. & Dev., 06-1557, pp. 12-13 (La.App. 1st Cir.1/16/08), 978 So.2d 454, 463-64, writs denied, 08-0347 (La.4/18/08), 978 So.2d 349, 08-0385 (La.4/18/08), 978 So.2d 349.
At the time of the accident at issue,[3] La. R.S. 9:2800 provided, in pertinent part:
A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
...
C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
D. Constructive notice shall mean the existence of facts which infer actual knowledge.
DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. Toston v. Pardon, 03-1747, p. 10 (La.4/23/04), 874 So.2d 791, 799. In a tort action against DOTD, the plaintiff must show: (1) the property that caused the damage was in the custody of the DOTD; (2) the property was defective because it had a condition that created an unreasonable risk of harm; (3) DOTD had actual or constructive notice of the risk; and (4) the defect in the property was a cause-in-fact of the plaintiff's injuries. Toston, 03-1747 at p. 10, 874 So.2d at 798-99. Ultimately, DOTD's liability to the public for the condition of state highways "depends on all the facts and circumstances determined on a case by case basis." Netecke v. State ex. rel DOTD, 98-1182, 98-1197, pp. 8-9 (La.10/19/99), 747 So.2d 489, 495.
Mr. Jenkins testified that because of the rain that morning, he could not work in his *758 lawncare business, so he decided to report to the police department to assist as a volunteer. Officer Chad Dorsett met him at the police station around 8:00 a.m. and they left together on patrol. After responding to a false report of a domestic disturbance, they heard a radio call from the Washington Parish sheriff's office requesting assistance in handling a motor vehicle accident on Louisiana Highway 25. They obtained permission to do so from their supervisor and proceeded toward the location. At some point after they passed a cemetery, prior to reaching Louisiana Highway 25, Mr. Jenkins observed that the unit was travelling at a speed of 45 to 50 miles per hour.
Mr. Jenkins explained that he was very familiar with Highway 25, traveling it about three times per day, and had traveled it before when it was raining. He explained that he "never drove fast" because of his awareness of the highway's condition. Mr. Jenkins described the weather at that time as "raining, just raining like I had not seen often in my life." Water was "ponding" on the roadway, and Mr. Jenkins saw passing vehicles spraying water on each other as they travelled. He also recalled that as they travelled the highway, Officer Dorsett's police unit was straddling the ruts, with the passenger's side tires near the white fog line near the shoulder. They were following another police department unit, which encountered a large puddle and sprayed water "like a big wave." Shortly thereafter, Officer Dorsett's unit spun out of control, and Mr. Jenkins saw the tractor-trailer approaching before he lost consciousness.
Chad Dorsett testified that although he was classified as a part-time police officer in the Franklinton police department at the time of the accident, he was working a fulltime shift. On December 23, 2003, the date of the accident, he was working the day shift from 6:00 a.m. to 6:00 p.m., accompanied by Mr. Jenkins, a reserve officer. After responding to a reported domestic disturbance, there was a radio call from the Washington Parish sheriff's office for assistance with an accident on Louisiana Highway 25 north of the town limits. After receiving permission to assist from his supervising sergeant, Officer Dorsett proceeded toward the accident location with his emergency lights and siren activated. As his unit approached the town limits, it was travelling approximately 25 to 30 miles per hour, but after leaving the town limits reached 55 to 60 miles per hour. Officer Dorsett recalled that his supervisor, Sergeant Revere, was travelling in another unit ahead of him. Although he had no recollection of the collision at issue, Officer Dorsett recalled that the rear of his unit began to slide left, he attempted to correct the slide, and he saw the approaching tractor-trailer through the passenger's side window before he lost consciousness.
Under cross-examination, Officer Dorsett confirmed that at the time of the accident, the automobile he was operating, Unit No. 6, was his regularly-assigned unit. He further admitted that he habitually inspected that unit before each shift in which he used it, and that the condition of wear on its tires prompted him to fill out and submit a vehicle maintenance sheet to the assistant chief on the morning of the accident date. There was a moderate to heavy rain falling when they received the radio call for assistance from the sheriff's office. Officer Dorsett admitted that he did not think about his tires' condition as he proceeded to the reported accident location, and confirmed his prior knowledge of the vehicle's previous accident and repaired condition, including the absence of airbags.
*759 Donald Folse, Jr. was the chief of police for the Franklinton police department at the time of trial. Prior to his employment with the Town of Franklinton, he worked for about eight to nine years as a deputy sheriff with the sheriff of Washington Parish. He was familiar with Louisiana Highway 25 for a period of approximately twelve years, and testified that the highway constantly held water during rainy weather. He had investigated prior accidents that occurred during rainy weather. Chief Folse explained that he typically drove with his driver's side tires on the center line of the highway during rainy weather, in order to straddle the ruts that held standing water.
Chief Folse testified that at the time of the accident, he was the second-ranking officer in the police department. After the Franklinton police department received a request to assist the Washington Parish sheriffs office regarding the first accident involving the pickup truck, Officer Chad Dorsett responded to the request, accompanied by Mr. Jenkins, a volunteer officer. After the accident at issue was reported, Chief Folse immediately drove toward the location, followed by another officer operating a third unit. The roadway was "flooded," although Chief Folse could not estimate the depth of standing water, and he drove at an approximate speed of 45 miles per hour, with the driver's side tires of his unit on the center line to avoid the water in the ruts. He recalled that at one point the police unit following his began to slide sideways, but the officer managed to regain control. Chief Folse pointed out the fact that the following unit had new tires placed upon it two days earlier.
Chief Folse arrived at the accident scene before the investigating state trooper did, and remained there until the injured officers were removed by ambulance. After the accident at issue, Chief Folse inspected the tires on the police unit driven by Officer Dorsett. He claimed that two of the tires were "in decent shape," another "definitely needed replacing," and the fourth "was well on its way" for replacement, but explained that the department attempted to do its best within a "tight budget." Chief Folse confirmed that the police department had a policy for its officers to inspect their units before use and to report defects to their supervising sergeants, but was unaware that Officer Dorsett had reported the conditions of his unit's tires on the day of the accident.
Marlin McClendon was the driver of the tractor-trailer involved in the accident. He testified that he and his wife were traveling south on Louisiana Highway 25 when he observed a power line cross his field of vision and strike his windshield and passenger's side mirror. After pulling over, he observed that the line went to a pole that had been struck by a pickup truck. After confirming that the pickup truck's driver was not injured, Mr. McClendon returned to his tractor-trailer and pulled back onto the highway. When his vehicle had reached a speed of about 35 to 40 miles per hour, he observed two police units approaching in the opposite lane. The first passed him, but the second unit began hydroplaning "like a boat going down the river" and entered his lane. Although Mr. McClendon applied his brakes, the police unit struck his vehicle. Mr. McClendon exited his vehicle to check on the automobile's occupants, who were both unconscious. Mr. McClendon described the highway as being "in bad shape" and "flooded in the ruts." He described the weather as a "downpour" and added that it "wouldn't quit raining."
Dwight Wicker, the driver of the pickup truck involved in the earlier accident, described the weather at the time of that accident as "severe" and "really bad," resulting *760 in "an awful lot of water on the road." According to Mr. Wicker, the water was standing in the road and not draining, and his truck simply slid off the roadway, despite his efforts to steer it and to apply the brakes. Mr. Wicker emphasized the fact that his truck's tires were new at the time.[4]
Deputy Ben Godwin of the Washington Parish Sheriff's office testified that he responded to the report of the accident involving Mr. Wicker, who advised him that his truck hydroplaned and he lost control. In the course of his investigation, Deputy Godwin confirmed that there was standing water in the roadway at that location. Deputy Godwin also testified that it was necessary for him to "drive offset," with his unit's tires straddling the highway's ruts, from Franklinton to the accident location. He admitted, however, that he drove to the scene at a speed of 75 to 80 miles per hour, and was able to maintain control of his unit. After Mr. McClendon's tractor-trailer struck the power line, Deputy Godwin radioed the Franklinton police department for assistance, as no other sheriff's units were available, and Officer Dorsett responded. Shortly thereafter, the accident at issue occurred, and Deputy Godwin ran to the scene. Deputy Godwin further testified that from 1999 to the time of trial, he had responded to ten to fifteen reported accidents on Louisiana Highway 25 that he attributed to loss of control due to standing water on the roadway.
Beverly Slade resided along Louisiana Highway 25 north of Franklinton. She testified that she was notified at her workplace of an accident causing property damage to her fence, and drove to the scene. She described the weather as "raining just horrible [sic]," and the highway as "full of water." En route, she passed the scene of the subsequent accident involving the police unit and the tractor-trailer. Ms. Slade described two earlier accidents in December 2002 and July 2003 that occurred during rainy weather and involved motorists losing control of their vehicles and running onto her property. Finally, Ms. Slade testified that the day after the July 2003 accident, during a heavy rain, she nearly lost control of her automobile when it slid and was unresponsive to steering as she prepared to turn into her driveway from the highway.
Laurie Burris, a registered nurse, resided near Franklinton and was familiar with Highway 25's condition prior to the accident at issue. She described the highway's condition prior to its overlay in 2005 as "[h]orrible, terrible, ruts just the worst I've ever ridden on" and "rutted and gutted." She estimated the depth of the standing water on Highway 25 north of Franklinton during rain as about two to three inches, and in some places more. She explained that if a motorist unfamiliar with the road encountered standing water, his vehicle might "go airborne," that she had hydroplaned once while driving, and that she had run off the roadway occasionally. During rainy weather, she would drive "[v]ery, very cautiously," at a speed of 40-45 miles per hour or less, and would attempt to avoid the ruts and water by driving closer to the shoulder. She confirmed that the posted speed limit on Highway 25 was 55 miles per hour.
Amanda Smith, a sheriff's deputy and dispatcher, testified that she regularly drove on Highway 25 for years prior to the accident at issue, and that over the five to *761 six years prior to the accident, the roadway was "extremely hard to drive in" because of "water buildup." She estimated the depth of standing water in the ruts at two to three inches. Deputy Smith explained that in such conditions it was necessary to straddle the ruts by driving closer to the shoulder or the center line, and that she would not drive more than 40 miles per hour.
Charlotte Lewis, a local resident, testified that she regularly traveled on Highway 25, and described its condition prior to the accident as "terrible." She explained that both lanes were rutted and would fill with water during rainy weather, and that her automobile had actually hydroplaned on the highway, despite having good tires. She also developed the habit of straddling the ruts by driving slightly on the shoulder, and would reduce her automobile's speed to about 40 miles per hour during rainy conditions.
Jeffrey Lewis testified that for years prior to the accident, he regularly drove on Louisiana Highway 25 north of Franklinton, where the accident at issue occurred. He explained that the highway had developed ruts that would hold water during rainy weather, and that drivers had to carefully straddle the ruts to avoid being involved in accidents. On the morning of the accident, he was driving south toward Franklinton and observed the pickup truck that had run off the highway. Shortly thereafter, Mr. Lewis passed two Franklinton police department units heading north with their emergency lights and sirens on. At that time, it was raining, and the highway's ruts in both lanes were "completely filled" with water, creating a "very dangerous" condition that prompted him to straddle the ruts to avoid the standing water.
Steven Schillings, a resident of Franklinton, also was called as a witness by the plaintiffs. He testified that during a number of years, through the time of the accident, Highway 25 north of Franklinton had "trenches" in its travel lanes, and that they would fill with water when it rained, causing vehicles to hydroplane. He also confirmed that it was necessary to straddle the ruts and to "slow down" and drive "very slow [sic]" during such conditions. Mr. Schillings further described two incidents in which his truck hydroplaned and left the roadway at the same location where Mr. Wicker's truck did on the accident date. He was also personally familiar with three other accidents at different locations where vehicles left the roadway of Highway 25 during rainy weather.
Gary Slade (witness Beverly Slade's husband) testified that he resided in the house adjacent to the location where Mr. Wicker's pickup truck left the highway and struck the fence and utility pole. His residence was a mile north of Franklinton. Mr. Slade confirmed the rutted condition of the highway and the propensity of the ruts to hold water during rain. He further testified that he was personally aware of three accidents from late 2002 through 2003 in which vehicles left the highway and struck his property's fence. He actually witnessed one of those accidents in July 2003, and prepared a written report or complaint to the Louisiana State Police concerning the situation. Mr. Slade explained that the location of the accident at issue was a quarter-mile from his property, and that the highway there had a tendency to "puddle" during rain, causing vehicles to hydroplane. Because of his familiarity with the highway's condition, he never drove faster than 35 miles per hour when it was raining.
Jessie McClendon was the district design engineer for DOTD's District 62, which is based in Hammond and includes Franklinton and the area of Highway 25 *762 at issue. He was called to testify as an adverse witness by the plaintiffs. Mr. McClendon testified that the duties of his office included planned development and construction, as well as investigation of highway drainage complaints. He explained that his office relies upon the maintenance personnel of each DOTD parish office to report problem highways and to recommend projects based upon the priority of need for repair. He stated that he expected any complaints to the Washington Parish DOTD office to be relayed to district headquarters in Hammond, but was unaware of any complaints concerning Highway 25 prior to 2003, as his duties as design engineer did not encompass maintenance functions. However, Mr. McClendon admitted that according to the geometric design guidelines of the American Association of State Highway Transportation Officials (AASHTO), generally followed by DOTD, rutting of a roadway is one of the main causes of poor skid resistance, as it causes water accumulation, which in turn may result in hydroplaning and loss of control. Finally, Mr. McClendon admitted that a subsequent resurfacing of Highway 25 in 2005 was prompted by his own observation of the highway's condition during rainy conditions during a family trip in early 2004, rather than from the Washington Parish maintenance unit.[5]
The plaintiffs also called Donald Ard, a retired DOTD maintenance supervisor, as an adverse witness. Mr. Ard testified that he was employed by DOTD for 32 years, and from 1990 to 2006 held the position of maintenance supervisor for Washington Parish. His duties included driving the roadways on a daily basis to inspect the condition of road surfaces, shoulders, and ditches, including any rutting of the roadway. He admitted that prior to the accident, he was personally aware that Louisiana Highway 25 north of Franklinton collected water during rain, but never reported that condition to DOTD's regional office in Hammond or the main office in Baton Rouge. He explained that although he reported it to the engineers in DOTD's Franklinton office, he did not consider the rutting to be bad enough to warrant further reporting. He further admitted that he or his office was notified by citizens or police officers of accidents involving water on the highway. Mr. Ard confirmed that Function 414 of DOTD's maintenance guidelines, addressing medium-sized areas of depression or rutting, prioritized repair of such conditions "where water is ponding over ½" deep" to be performed "as soon as resources are available, interrupting routine work activities if necessary."
Frank Griffith, Ph.D., a university physics professor, testified as an expert in the fields of physics and accident reconstruction. He testified that he inspected, measured, and photographed the accident location and the damaged police unit in January 2005. He described the highway condition at that time as "rutted fairly badly." Utilizing a computer program in which the crush or damage measurements of the police unit were provided, Dr. Griffith concluded that the speed of the police unit at impact was approximately 30 miles per hour.
Dr. Griffith explained the concept of "dynamic hydroplaning" as it related to motor vehicle tires on wet pavement. As the vehicle speed and water depth are increased, a "dynamic lift" of the tire occurs, similar to that involved in waterskiing. *763 He testified that once the tire's tread is flooded, hydroplaning can occur regardless of the tread's depth. With regard to the tread depth on Unit No. 6's tires, Dr. Griffith testified that the tread depth of the right front tire varied from zero to 1/32 of an inch; that of the right rear tire varied from 1/32 to 2/32 of an inch; that of the left front tire varied from 4/32 to 5/32 of an inch; and that of the left rear tire varied from 2/32 to 3/32 of an inch. Dr. Griffith also concluded that the water depth encountered by Unit No. 6, up to 1 1/3 inches in his opinion, was enough to flood the treads of new tires and to contribute to hydroplaning.
Under cross-examination, Dr. Griffith conceded that if only one tire failed to conform to the minimum standards set forth in the motor vehicle inspection regulations, the vehicle would not pass a safety inspection. When asked what water depth would be sufficient to cause a hydroplane on a tire with tread of zero to 1/32 of an inch, Dr. Griffith replied that he did not know, but admitted that "the more shallow the tread the easier it is to flood." He also admitted that the shallower the tread, the less water can be forced out from beneath the tire through the tread grooves.
Vernon "Dean" Tekell, Jr., a civil engineer, was called to testify by DOTD as an expert in the fields of accident reconstruction and traffic engineering, including design, construction, and traffic controls of highways. After reviewing the accident report, accident investigation photographs, and other relevant documents, he inspected the accident location in March 2005. According to Mr. Tekell, the highway was in essentially the same condition as that of the accident date. In the vicinity of the impact between the police unit and the tractor-trailer, the highway exhibited a "classic rutting pattern," in which the wheel paths in both lanes were worn lower than the middle area between them.
To assist his analysis, Mr. Tekell had a cross-section survey of the roadway performed by a land surveyor. The survey was performed over a distance of 600 feet, starting at the location of the impact between the vehicles and continuing south along the path the police unit traveled on the accident date. The survey confirmed that there were areas of rutting that were capable of retaining standing water. Within the first 200 feet south of the impact location, one rut near the center line could have held a quarter-inch of water. The deepest rut within the 600 feet surveyed was capable of holding three-quarters of an inch of water over a length of 40 feet.
Mr. Tekell also inspected the police unit, measuring its crush damage in order to estimate the speed at impact, and inspected the unit's tires. According to Mr. Tekell, three of the four tires had little or no tread, and he characterized them as being "some of the worst tires" he had ever seen in the course of inspecting vehicles. He explained that for tires in that condition, having tread depth of 2/32 of an inch or less, hydroplaning on a wet roadway can be expected once a vehicle exceeds 40 miles per hour.[6]
*764 Mr. Tekell concluded that there were three contributing factors that contributed to the occurrence of the accident: (1) the rutting of the highway, which made vehicles susceptible to hydroplaning when water collected on the roadway surface; (2) the condition of the police unit's tires; and (3) the excessive speed at which Officer Dorsett operated the unit, given the unusual weather conditions.
Under cross-examination, Mr. Tekell conceded that once standing water on a roadway reaches a certain depth, even well-treaded tires will hydroplane. He emphasized, however, that while the depth of standing water is a factor subject to DOTD's control, the speed of a vehicle being operated is subject to its driver's control, and is also a factor in hydroplaning. On redirect examination, Mr. Tekell explained that a posted highway speed limit represents the maximum safe speed for ideal weather conditions.
The police unit operated by Officer Dorsett left its lane of travel, crossed the center line, and struck the tractor-trailer, travelling in its proper lane of travel. Under these circumstances, DOTD was entitled to a legal presumption that Officer Dorsett was negligent in his operation of the police unit. See Simon v. Ford Motor Co., 282 So.2d 126, 128 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330, 1335-36 (La.1978); and Kolwe v. Taylor, 517 So.2d 236, 238 (La.App. 1st Cir.1987).
The general speed law applicable to the safest maximum speed of motor vehicles is set forth in La. R.S. 32:64(A), which provides that "[n]o person shall drive a vehicle on the highway within this state at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather...." (Emphasis supplied.) It should therefore be borne in mind that a highway's posted speed limit is the officially-recognized maximum safe speed for motor vehicles thereon under normal weather conditions, as opposed to unusual and dangerous weather conditions. See, e.g., Capone v. Ormet Corp., 01-0060, pp. 5-6 (La.App. 1st Cir.6/21/02), 822 So.2d 684, 689-90, writ denied, 02-2379 (La.11/22/02), 829 So.2d 1051.
A motorist has a duty to maintain control of his vehicle, even in rainy and inclement weather conditions. Ferrell v. Fireman's Fund Ins. Co., 94-1252, pp. 6-7 (La.2/20/95), 650 So.2d 742, 747. Extremely adverse driving conditions call for unusual caution on the part of motorists. Hebert v. Lafayette Consol Gov't, 05-1452, p. 7 (La.App. 3rd Cir.5/3/06), 930 So.2d 281, 285. A reasonably prudent driver need not be warned of conditions that are patent and obvious. The normal hazards of driving on a wet surface in a hard rain include a slight decrease in traction and diminished visibility, and these hazards are patent and obvious to any driver. See Robinson v. Estate of Haynes, 509 So.2d 128, 132 (La.App. 1st Cir.1987). In Brooks v. Kirkpatrick, 175 So.2d 342, 345 (La.App. 2nd Cir.1965), the court pointedly observed that it is "reasonable to infer that a tire without tread is dangerous when operated on a wet asphalt highway at an excessive rate of speed."
In the case of Bush v. State, through Dep't of Highways, 395 So.2d 916 (La.App. 2nd Cir.1981), writs denied, 399 So.2d 609 *765 (La.1981), an automobile spun and crossed the center line of a wet highway, striking an oncoming vehicle in the opposite lane. A steady rain had fallen all day, and both highway lanes had depressions or ruts in which water had accumulated. The evidence established that the first driver was traveling at least 59 miles per hour when he lost control as his automobile began to hydroplane. In affirming the trial court's judgment absolving DOTD of liability, the court observed "[r]ain collecting in depressions on an old highway is not an unusual situation." Id. at 921. The court further observed that the particular stretch of highway had "the same type of ruts and depressions" as those at the accident scene, and that the plaintiff must have observed those "plainly visible" ruts over a considerable distance as he approached the accident scene. Id.
In Shephard v. Scheeler, 96-1690, p. 16 (La.10/21/97), 701 So.2d 1308, 1317, the supreme court observed that "[a] small amount of puddling" on a roadway "would be impossible to prevent, and for the most part these puddles pose no unreasonable danger to the traveling public." However, it also recognized that "excess or standing water in the roadway is unreasonably dangerous." Shephard, 96-1690 at p. 17, 701 So.2d at 1317.[7]See also Garcia v. La. Dep't of Transp. & Dev., 00-0930, p. 6 (La.App. 4th Cir.5/16/01), 787 So.2d 1142, 1146.
In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La. 1985), the supreme court articulated the factors appropriate for consideration in allocating fault between two or more parties:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in. haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
The allocation of comparative fault between joint tortfeasors is a factual determination, and the trier of fact's allocation is therefore owed deference. Snearl v. Mercer, 99-1738, p. 27 (La.App. 1st Cir.2/16/01), 780 So.2d 563, 584, writs denied, 01-1319 (La.6/22/01), 794 So.2d 800 and 01-1320 (La.6/22/01), 794 So.2d 801. However, the supreme court in Watson made a point of observing that "appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court." Watson, 469 So.2d at 972, citing Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). It further held that proper review requires the appellate court to determine whether that finding, even if supported by evidence, was clearly wrong or manifestly erroneous. Watson, 469 *766 So.2d at 972. Stating the principle somewhat differently, the court concluded:
It is not enough to sustain the determination of the district court when "there is some reasonable evidence to support the finding." Rather, the appropriate question is, was that finding clearly wrong or manifestly erroneous.
Id.
Thus, a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993). If the court of appeal finds an apportionment of fault by the trial court clearly erroneous, it should lower or raise it to the highest or lowest point reasonably within the trial court's discretion. Clement v. Frey, 95-1119, pp. 7-8 (La.1/16/96), 666 So.2d 607, 611.
The evidence clearly supports the jury's determination that the highway at issue was unreasonably dangerous, that DOTD had both actual and constructive notice of the risk posed by the highway's condition, and that its condition was a cause-in-fact of the accident at issue. The testimony clearly established that the rutted condition of Highway 25 was longstanding prior to the accident, and that the highway's propensity to hold standing water during rainy weather was unreasonably dangerous.
However, the evidence also clearly supports the finding that the Town of Franklinton, through the Franklinton police department, was also at fault in failing to properly maintain the police unit operated by Officer Dorsett and in permitting him to use it in its unsafe condition. While we recognize that smaller municipalities may have limited operating budgets for their police departments, they are nevertheless required to comply with the same motor vehicle regulations as the general public. It seems only reasonable, in fact, that a municipality charged with enforcement of the laws, including traffic laws, should set an example through proper maintenance of its police vehicles. See La. R.S. 32:41. Although the evidence indicated that even vehicles with new tires may hydroplane given the existence of threshold conditions of water depth and vehicle speed, the preponderance of the evidence also showed that the tire condition of Unit No. 6 made hydroplaning virtually inevitable, given its speed of operation and the adverse weather conditions on the date of the accident.
Although the police unit belonged to the Town of Franklinton, which was responsible for its maintenance and repair, the police department obviously depended upon its employee, Officer Dorsett, to inspect the unit assigned to him and to report any unsafe conditions and required maintenance. His conscious decision to use the unit despite the unsafe condition of the unit's tires, and his knowing operation of the unit at an unsafe speed, given its condition, the weather, the non-emergency nature of the call, and the close proximity of the call location (only about three-quarters of a mile from the town limits) further supports the jury's finding of fault attributable to the Town of Franklinton. See, e.g., Thompson v. Coates, 29,333, p. 6 (La. App. 2nd Cir.5/7/97), 694 So.2d 599, 604-5, writs denied, 97-1442 (La.9/26/97), 701 So.2d 985, 97-1521 (La.9/26/97), 701 So.2d 987, and Pino v. Gauthier, 633 So.2d 638, 654 (La.App. 1st Cir.1993), writs denied, 94-0243 (La.3/18/94), 634 So.2d 858; 94-0260 (La.3/18/94), 634 So.2d 859.
*767 Although we agree with the jury's determination that the majority of the fault rests with DOTD, the evidence could very well have supported a greater apportionment of fault for the accident based upon the negligence of Officer Dorsett and the Franklinton police department. Nevertheless, the jury evidently concluded that the condition of Unit No. 6's tires and the unit's speed were not as significant causative factors as the highway condition, and in its discretion apportioned only 10% of the fault to the Town of Franklinton. We cannot conclude that the jury's apportionment of fault was manifestly erroneous, given the totality of the evidence in the record. We therefore affirm the trial court's judgment on this issue.

General Damages
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. U.S. Fidelity and Guar. Ins. Co., 94-0304, p. 7 (La.App. 1st Cir.5/5/95), 655 So.2d 431, 437. The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. Thibodeaux v. USAA Cos. Ins. Co., 93-2238, p. 8 (La.App. 1st Cir.11/10/94), 647 So.2d 351, 357.
The trier of fact is accorded much discretion in fixing general damage awards, La. C.C. art. 2324.1; Cheramie v. Horst, 93-1168, p. 6 (La.App. 1st Cir.5/20/94), 637 So.2d 720, 723. The discretion vested in the trier of fact is "great," even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the jury abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). Reasonable persons frequently disagree about the measure of general damages in a particular case. Youn, 623 So.2d at 1261. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Id. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate or excessive. See Theriot, 625 So.2d at 1340. We therefore must review the particular circumstances of Mr. Jenkins's injuries.
Mr. Jenkins was rendered unconscious as the result of the collision. He was taken by ambulance to the emergency room of Riverside Medical Center in Franklinton. It was recorded in the emergency room record that clear fluid with a bloody tinge (later described as cerebrospinal fluid) was dripping from Mr. Jenkins's *768 right ear. The emergency room physician diagnosed an acute subdural hematoma.
Frank Cullichia, M.D., a neurosurgeon, testified by videotaped deposition. Dr. Cullichia first saw Mr. Jenkins in the intensive care unit of West Jefferson Medical Center on December 29, 2003, the sixth day after the craniotomy surgery performed by Dr. Steck to remove the subdural hematoma. He assumed Mr. Jenkins's neurosurgical care when Dr. Steck went off call. Dr. Cullichia explained that a subdural hematoma is a blood clot between the covering of the brain and the brain's outer surface, and is often a life-threatening injury requiring surgery. On the day he first saw Mr. Jenkins, Dr. Cullichia determined that Mr. Jenkins had developed an epidural hematoma, a large blood clot between the bone of the skull and the covering of the brain. Dr. Cullichia performed a second craniotomy procedure, reopening the prior surgical incision and the skull bone again in order to remove the epidural hematoma. Because Mr. Jenkins continued to have spinal fluid leaking from his right ear, due to a fracture of the base of the skull, Dr. Cullichia placed a tube in the cavity of the brain to drain the fluid and to relieve pressure from the fluid at the fracture site.[8]
Mr. Jenkins did well postoperatively, and was ultimately discharged from the hospital on January 6, 2004, eight days after the second craniotomy procedure. At the time of discharge, he was able to walk without assistance, and no longer had fluid draining from his right ear. However, he had no hearing in his right ear, and Dr. Cullichia asked him to consult an ENT specialist. Dr. Cullichia also scheduled Mr. Jenkins for outpatient therapy, including physical therapy, occupational therapy, and speech therapy. The latter therapy was recommended because Mr. Jenkins had some difficulty speaking following surgery, which Dr. Cullichia felt was possibly due to a focal seizure caused by bruising of the brain. Dr. Cullichia explained that although Mr. Jenkins is potentially at risk for future focal seizures, each day that passes without the occurrence of a seizure lessens that risk.
Dr. Cullichia saw Mr. Jenkins again on an outpatient basis on January 14. At that time, his scalp incision had healed well, but he still had no hearing in his right ear. On examination, the eardrum was not ruptured, and there was no fluid behind it. An audiogram that had been performed by another physician showed complete loss of hearing. Dr. Cullichia referred Mr. Jenkins to a neurootologist, and advised him to return in two weeks following a CT scan of the brain. On February 6, 2004, Mr. Jenkins's only significant complaints were those of severe double vision and headaches. The examination confirmed evidence of double vision, and Dr. Cullichia agreed with another physician's recommendation that Mr. Jenkins wear glasses with prisms to correct that problem. The CT scan previously ordered revealed some fluid collection over the surface of the brain, but Dr. Cullichia described that finding as "not unexpected" and asymptomatic in nature.
When he next saw Mr. Jenkins on March 24, 2004, Dr. Cullichia felt that he was "doing exceptionally well," with the exception of continued complete hearing loss in the right ear, which another physician had concluded was permanent in nature. Mr. Jenkins was complaining of some dizziness and inquired about discontinuing Dilantin, an anti-seizure medication. *769 Dr. Cullichia recommended that he continue for a time with that medication as a prophylactic measure to prevent the possibility of a seizure while driving. On the next visit of April 19, 2004, it was noted that Mr. Jenkins had discontinued the Dilantin, and was not having any problems in that regard. However, he was complaining of numbness in both arms when putting his head downward, which caused Dr. Cullichia to suspect a cervical spine problem. X-ray films obtained that day did not reveal any abnormalities, and Dr. Cullichia recommended an MRI study. The MRI study was performed on April 21, 2004, and did not reveal any evidence of neck or spinal cord injury or other abnormalities. Dr. Cullichia did not treat Mr. Jenkins after that occasion.
On cross-examination, Dr. Cullichia reiterated his opinion that Mr. Jenkins "had a very remarkable recovery," considering the nature of his injuries. Other than the permanent hearing loss, Dr. Cullichia did not note any other "serious disabilities." He confirmed that the April 21, 2004 MRI study did not reveal any traumatic disc injury. Comparing those findings with those in a report from a 2005 standing MRI study, Dr. Cullichia noted that the findings described in the latter report were "typical signs of aging that one would expect."
Mark James, M.D., is a board-certified family practitioner and Mr. Jenkins's family physician. He described Mr. Jenkins's general health prior to the accident as excellent. Dr. James first saw Mr. Jenkins after the accident on March 1, 2004. At that time, Mr. Jenkins was complaining of chest pain and soreness and shortness of breath. A chest x-ray film confirmed three rib fractures, and Dr. James ordered a CT scan of the sternum to rule out a fracture at that location. That study did not show a sternal fracture, but did reveal areas of bruising. Dr. James prescribed pain medication for the chest pain. When Mr. Jenkins returned to Dr. James in May 2004, he was complaining of diffuse pain, numbness, and weakness of the arms and legs upon flexing his neck forward. He was also complaining of some short-term memory loss. Although the physical examination was generally unremarkable, the extremity symptoms were reproduced on neck flexion. Dr. James was very concerned about spinal cord compression caused by a fracture, ruptured disc, or other injury, and felt that a neurological consultation was necessary. Dr. James also noted that Mr. Jenkins would tear up easily, a symptom that Dr. James suspected might be due to personality change associated with an injury to the frontal portion of the brain.
Morteza Shamsnia, M.D., a board-certified neurologist, first evaluated Mr. Jenkins in May 2004, at the request of Mr. Jenkins's attorney. Dr. Shamsnia characterized the head injury as "an extensive brain injury" from "a major head trauma," including complete destruction of the eighth cranial nerve on the right, with corresponding loss of hearing on that side. On examination, Dr. Shamsnia noted nystagmus, a jerky motion of the eyes when looking from side to side. He attributed that sign to damage to the nerves controlling eye movement. Dr. Shamsnia also concluded that Mr. Jenkins more probably than not sustained bruising of his spinal cord, which accounted for symptoms of arm and spine numbness when bending his neck down. Based upon Mr. Jenkins's history and complaints of headaches, sleep dysfunction, and memory problems, Dr. Shamsnia diagnosed a postconcussion syndrome.
Dr. Shamsnia ordered EMG and nerve conduction studies, which showed delayed responses corroborating bruising of the *770 spinal cord, brain injury, or both. Those tests also revealed nerve root impingement at the C4 neurological level of the cervical spine and the L5 neurological level of the lumbar spine. A standing MRI study was interpreted as showing bulging discs at the C3-C4 and C4-C5 levels of the cervical spine and herniated discs at the L4-L5 and L5-S1 levels of the lumbar spine. A sleep study demonstrated abnormal sleep structure, with significantly reduced rapid-eye-movement (REM) or "deep" sleep, essential for mental well-being. Given the history of focal seizures, Dr. Shamsnia felt that Mr. Jenkins had a "high risk" of developing seizures in the future, and was a candidate for an extensive epileptic workup. Dr. Shamsnia also believed that Mr. Jenkins would require pain and sleep medication for an indefinite period, probably the rest of his life.
Ronald G. Amedee, M.D., a physician specializing in otolaryngology (ear, nose and throat medicine), evaluated Mr. Jenkins on February 20, 2004, and his report was admitted into evidence. In his history, Dr. Amedee noted that Mr. Jenkins was "involved again in the day-to-day management of [his] lawn care business." In addition to a physical examination, Dr. Amedee performed an audiogram that showed "essentially a dead ear on the right side." His diagnosis was sensorineural hearing loss caused by trauma. Dr. Amedee felt that it was highly unlikely that Mr. Jenkins would recover any hearing in the right ear, and that hearing amplification on that side would be useless. However, he felt that Mr. Jenkins might consider using a CROS aid, a device that would route sound from the area of the right ear to the normal left ear. He recommended that Mr. Jenkins use earplugs in his left ear to conserve its hearing, considering the equipment used in his lawncare occupation, and that he have annual hearing examinations.
Joyce R. Adema, O.D., performed a neuro-optometric evaluation of Mr. Jenkins on July 14, 2004, and her report was introduced into evidence. Based upon her testing, Dr. Adema concluded that Mr. Jenkins had a post-traumatic vision syndrome, due to trauma to his third, fourth, and sixth cranial nerves, causing him blurred vision, double vision, inadequate fusion (combining visual information from both eyes), headaches, and other difficulties. She prescribed reading glasses and nine to twelve months of optometric vision therapy.
Mr. Jenkins was also evaluated by a second neurosurgeon, Donald Dietze, M.D., on one occasion, on October 31, 2005. Dr. Dietze did not testify at trial, but copies of two narrative reports detailing his examination findings and opinions were introduced into evidence at trial. At the time of the evaluation, Mr. Jenkins was complaining of bilateral low back pain and bilateral lower extremity radiculitis, with the back pain being greater than the leg pain. On examination, Dr. Dietze noted that Mr. Jenkins had a "full active range of motion" of the lumbar spine, with pain reported at the end range of extension and flexion. The sensorimotor examination was normal. There was "mild tenderness" of the mid-lumbar area. Based upon his examination and the reports of the prior diagnostic studies, Dr. Dietze diagnosed disc protrusions at the L4-5 and L5-S1 levels, and expected Mr. Jenkins to experience chronic low back pain for the rest of his life. For further treatment, Dr. Dietze recommended epidural steroid injections, to be followed by physical therapy for lumbar strengthening if the injections were successful. As of the date of the second report, March 16, 2006, the epidural steroid injections had not been performed. Dr. Dietze noted that Mr. Jenkins was not ready to consider surgery, *771 but would consider it if the other treatment alternatives were unsuccessful. The surgical options were a two-level spinal fusion or an L5-S1 fusion with an artificial disc replacement at the L4-5 level. Between the two, Dr. Dietze recommended the latter option, at an estimated cost of $25,647.73.
Mr. Jenkins was first evaluated by Kevin Bianchini, Ph.D., a clinical psychologist and neuropsychologist, on June 9, 2004. After reviewing Mr. Jenkins's history and medical diagnoses, Dr. Bianchini and his office's technicians administered a standard battery of neuropsychological tests. Testing revealed continuing mild to moderate impairment of Mr. Jenkins's mental faculties, including inappropriate naming of objects and concepts, impaired self-monitoring (awareness of personal limitations), and moderate verbal memory impairment. Other testing also revealed some impairment in motor function and "executive functions," or high-level reasoning and problem-solving. The latter areas caused Dr. Bianchini some concern about Mr. Jenkins's ability to manage his own business, although he recommended rehabilitation to "solidify" the improvement shown since the initial evaluation.
According to Dr. Bianchini, the test findings were consistent with the "very severe" brain injury Mr. Jenkins sustained, and he found no evidence to suggest malingering. Dr. Bianchini felt that although Mr. Jenkins had shown some improvement over time, and might show further improvement, he would likely have some permanent impairment in those areas, and has limited vocational potential due to his injuries and their effects. After again evaluating Mr. Jenkins on a later occasion, Dr. Bianchini concluded that he also had problems in multitasking related to his injury. Dr. Bianchini's psychological diagnosis for Mr. Jenkins was that of a general cognitive disorder. He felt that Mr. Jenkins was motivated and would benefit from a rehabilitation program.
Mr. Jenkins testified that he was 33 years old at the time of trial, married, and the father of four children. After graduating from high school, he attended college for two and a half years, but did not complete his studies. He played sports in high school and college, and later worked for an offshore drilling company as a roustabout and floor hand and for a home health care company. He then worked for an automobile dealer as a parts service director. Around the middle of 2002, he started a part-time lawncare business. In 2003, he left his employment with the automobile dealer to work fulltime in his lawncare business.
Mr. Jenkins described his memory of his hospitalizations and post-discharge recovery at home, as well as the effects of his injuries. He testified that he had headaches on a daily basis, especially when performing tasks that require concentration. Since the accident, he experienced back and neck pain and numbness in his arms and legs when bending his neck forward. After performing physical activity, he feels "flu-like symptoms" and aching of his joints. Mr. Jenkins also described his complete loss of hearing in his right ear and his need to use special glasses with prisms to correct his vision problems caused by the accident. Since the accident, he has also had some difficulty with his balance. With regard to his mental abilities, Mr. Jenkins described decreased memory and increased susceptibility to stress when performing multiple tasks. He explained that because of his physical and mental inability to personally manage and participate in his lawncare business, he began working in January 2006 in the maintenance department of Riverside Medical Center, a less demanding job paying *772 $29,000.00 per year, Mr. Jenkins further described the limitations his injuries and impairments placed upon his ability to perform household duties and to play with his children, noting that his wife or oldest son has to cut the grass at their home.
After carefully considering the evidence relating to Mr. Jenkins's injuries and their effect upon his life, we cannot say that the jury abused its vast discretion in its award of $3,000,000.00 general damages to him. DOTD is a state agency, and the Town of Franklinton is a political subdivision of the state; thus, the statutory cap of $500,000.00 under La. R.S. 13:5106(BX1) is the total amount recoverable from both. See Engles v. City of New Orleans, 03-0692, p. 16 (La.App. 4th Cir.2/25/04), 872 So.2d 1166, 1178, writs denied, 04-1432 (La.9/24/04), 882 So.2d 1141, 04-2654 (La.1/7/05), 891 So.2d 697. As the jury's award of general damages exceeded the maximum recoverable amount of $500,000.00, the trial court in its judgment fixed the maximum recoverable amount of general damages at $500,000.00 and then reduced that amount by 10%, the Franklinton police department's percentage of fault, to $450,000.00. We accordingly affirm the trial court's final adjusted award of general damages to Mr. Jenkins.

Past Loss of Earnings
The jury awarded Mr. Jenkins the sum of $85,000.00 for "past wage loss" for the period from the accident date to the time of trial, approximately 27 months. We initially note that Mr. Jenkins had reported earnings of $36,629.66 while working for the automobile dealer in 2002, the full year prior to the accident. Given his assumptions regarding the potential income of Mr. Jenkins's lawncare business, described infra, the plaintiffs' economic expert, Harold Asher, C.P.A., estimated Mr. Jenkins's past lost earnings to vary from $73,663.00 (based upon his prior employment by the automobile dealer) to $191,537.00 (net profit from the lawncare business with one two-man crew) to $409,509.00 (net profit from the lawncare business with two two-man crews). DOTD's economic expert, Dan Cliffe, C.P.A., testified that the appropriate wage base was Mr. Jenkins's average annual earnings for the years 2000 through 2003. Assuming an annual wage base of $33,257.69, Mr. Cliffe estimated Mr. Jenkins's past lost earnings from the accident date to the time of trial to amount to $52,653.00, after deduction of Mr. Jenkins's 2005 and 2006 earnings. Using an alternate pre-accident wage base of $37,866.00 (based upon average earnings in the three years of 2000 through 2002), Mr. Cliffe estimated those past lost earnings to amount to $62,976.00.
While an injured person's earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. Damages for loss of such earning capacity, both past and future, should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury. Folse v. Fakouri, 371 So.2d 1120, 1123 (La.1979). Based upon our review of the evidence, we cannot conclude that the jury abused its discretion in awarding Mr. Jenkins $85,000.00 for "past wage loss," inclusive of loss of past earning capacity, over a 27-month period.

Loss of Future Earnings
Unlike awards for past lost earnings, awards for lost future income or loss of future earning capacity are inherently speculative and are intrinsically incapable of being calculated with mathematical certainty. Williams v. Rubicon, Inc., 01-0074, p. 10 (La.App. 1st Cir.2/15/02), 808 So.2d 852, 862, writ denied, 02-0802 *773 (La.12/4/02), 833 So.2d 942, cert. denied, 540 U.S. 812, 124 S.Ct. 54, 157 L.Ed. 25 (2003). For that reason, the trial court is given much discretion in fixing such an award. Id. Additionally, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d 850, 853 (La. 1990).
Mr. Barney Hegwood testified as an expert witness in the fields of vocational rehabilitative counseling and life care planning. He testified that he conducted a labor market survey of lawncare businesses in the North Shore region, although he admitted that obtaining earnings information related to self-employed business owners was more difficult than that related to regular employees. According to Mr. Hegwood, the labor market survey showed that one two-man lawncare crew could earn $600.00 per day, and that Mr. Jenkins's business had the potential for gross earnings greater than its 2005 gross earnings. He also expressed the opinions, based upon his review of the medical records and interviews with Mr. and Mrs. Jenkins, that Mr. Jenkins would be unable to work as the owner and operator of a lawncare business and that Mr. Jenkins's maximum future earning capacity was $27,300.00 per year, his salary in his current occupation.
Mr. Hegwood admitted under cross-examination, however, that "gross sales has [sic] nothing to do with your income," and that he could not "translate" a business's gross earnings into its owner's personal earnings. He also admitted that he did not conduct any actual vocational testing on Mr. Jenkins, instead relying upon the neuropsychological testing performed by Dr. Bianchini.
The plaintiffs called Harold Asher, C.P.A., to testify as a certified public accountant and forensic accountant with expertise in calculation of projected future medical costs. With regard to Mr. Jenkins's reported business earnings on his tax returns from 2003 to 2005, Mr. Asher noted that the gross business income was about $20,000.00 in 2003, about $40,000.00 in 2004, and $187,000 in 2005. He explained that Mr. Jenkins's net reported earnings did not accurately reflect Mr. Jenkins's true earning capacity in his business, as the accident occurred less than a year after he started the business. He asserted that Mr. Jenkins would probably have operated the business differently and been more personally involved had he not been injured.
Mr. Asher presented three alternative scenarios with regard to Mr. Jenkins's loss of past earnings and loss of future earning capacity, each assuming a worklife to age 65, but based upon a different assumed wage or earnings base. The first scenario used an assumed annual earning capacity of $97,500.00, based upon $160,000.00 in gross business revenues in his lawncare business with one two-man crew, and an assumed profit margin of 60%, based upon a document signed by Robbie Thomas, the owner of a similar business. Assuming an annual wage growth rate of 3% and a discount rate of 3.5%, and factoring in Mr. Jenkins's annual wages in his new employment, Mr. Asher estimated the present value of the loss of future earning capacity under that scenario to be $2,040,831.00. In the second scenario Mr. Asher proposed, it was assumed that there would be $195,000.00 in annual net earning capacity, based upon $350,000.00 in assumed gross income with two two-man lawncare crews, along with the other assumptions relating to the wage growth rate, discount rate, and assumed future earnings. Under the second scenario, the present value of the *774 loss of future earning capacity would be $5,622,262.00. Finally, the third scenario assumed that Mr. Jenkins's annual earning capacity was $40,247.00, the average annual income reported during his employment with the automobile dealer from 2001 through 2003, combined with annual fringe benefits of $5,666.00. Using the same economic assumptions for wage growth rate, discount rate, and assumed future earnings, the present value of lost future earning capacity and fringe benefits would be $584,892.00.
Under cross-examination, Mr. Asher claimed that actual past earning history as reflected on tax returns was not representative of Mr. Jenkins's individual earning capacity. He admitted that the first scenario he postulated was based upon an unsigned "affidavit" of Robbie Thomas, supposedly detailing Mr. Thomas's revenue and profit with one two-man lawncare crew. But Mr. Asher conceded that he never interviewed or spoke with Mr. Thomas, and that there is no published information available related to the earning capacity of a lawncare business owner in Washington Parish.
DOTD called Dan Ciiffe, C.P.A., as an expert witness in the field of forensic accounting and economics. Based upon national worklife tables published by the federal government, Mr. Cliffe determined that Mr. Jenkins's future worklife expectancy on the date of the accident was 28.5 years. As to his demonstrated wage base or past earning capacity as of that date, Mr. Ciiffe first used a figure of $33,257.69, Mr. Jenkins's average annual earnings for the years 2000 through 2003. Using the figure of $27,000.00 as Mr. Jenkins's post-accident wage base, Mr. Ciiffe estimated his loss of future income to fall in the range of $112,000.00 to $141,280.00. Using the alternate pre-accident wage base of $37,866.00 (based upon average earnings in the three years of 2000 through 2002), Mr. Ciiffe estimated Mr. Jenkins's loss of future income to fall between $194,412.61 and $245,323.48.
Mr. Cliffe expressed disagreement with certain assumptions and calculations made by the plaintiffs' expert, Mr. Asher. Initially, he disagreed with Mr. Asher's assumption that Mr. Jenkins would have worked continuously until age 65, with no interruptions for any reason. He also disagreed with the alternate wage bases of approximately $195,000.00 to $409,509.00, based upon Mr. Jenkins's status as a small business owner, as being purely speculative. He criticized Mr. Asher's discount rate of 3.5% as being unrealistically low, thereby inflating the projected future loss. Finally, Mr. Cliffe emphasized his disagreement with Mr. Asher's projections of future loss of income, as failing to take into account the documented statistics of small business closures due to factors such as competitive pressures. He specifically criticized Mr. Asher's reliance on the Robbie Thomas "affidavit" as non-scientific and unacceptable for purposes of forming a forensic economic opinion.
According to Mr. Jenkins's own trial testimony, he simply gave up some customer accounts, as opposed to actually losing them, in order to avoid "hav[ing] people talk about [him] doing bad jobs." However, there was no evidence whatsoever of any actual customer complaints about the quality of his business's work. He testified that although his father and his employees had "always" helped him in his business (even prior to the accident), he felt that no one other than he could properly manage the business. He claimed that after his injuries, he "felt compelled physically and mentally to abandon" his lawn care business. At the time of trial, however, he still owned all four trucks and all lawncare equipment used in his business, *775 and his son and one employee continued to service some commercial accounts for the business.
It is well settled that the proper measure of damages for loss of earning capacity is not an injured person's actual pre-injury earnings. Nevertheless, an expert's projections of loss of future earning capacity must have a factual basis in the record, and an award may not be based upon speculation, possibility, or conjecture. See Bolton v. Nagalla, 609 So.2d 1134, 1144 (La.App. 2nd Cir.1992), writ denied, 615 So.2d 338 (La.1993).
The evidence does not unequivocally or conclusively demonstrate that Mr. Jenkins is incapable of owning and operating a profitable lawn care business with other employees performing the most demanding physical labor. The plaintiffs' own evidence showed that Mr. Jenkins had increasing gross business income as a lawncare business owner from 2004 to 2005, within the first two years after the accident, when the effects of his injuries upon his earning capacity would have been most pronounced and when most improvement would have occurred, according to Dr. Bianchini. The only evidence upon which the jury's award could conceivably be based was Mr. Jenkins's documented post-accident gross earnings (before deduction of business expenses) in his business in 2005, unsubstantiated speculation that the business would have expanded to include two to three two-man crews, and the vague and uncorroborated assertions of the Robbie Thomas "affidavit," relating to another supposedly comparable small business.[9] While all awards for loss of future earnings or impairment of future earning capacity necessarily must involve some speculative assumptions, the extent of the loss found by the jury clearly is not justified by the facts and the preponderance of the evidence, and therefore constitutes an abuse of discretion.
After carefully considering all of the evidence in the record, we conclude that the amount of the jury's award for loss of future earnings should be reduced to the highest amount reasonably within the jury's reasonable discretion and supported by the evidence. See Ryan v. Zurich American Ins. Co., 07-2312, p. 7 (La.7/1/08), 988 So.2d 214, 218-19, and Dennis v. The Finish Line, Inc., 99-1413, p. 39 (La.App. 1st Cir.12/22/00), 781 So.2d 12, 42, writ denied, 01-0214 (La.3/16/01), 787 So.2d 319. We find that amount to be $2,040,831.00, the lower figure used by Mr. Asher and based upon the first scenario he proposed. This figure gives Mr. Jenkins the benefit of the doubt regarding his potential loss and impairment of future earning capacity, supported by the weight of the evidence without unsupported speculation, *776 while at the same time taking account of his residual earning capacity in his new occupation.

Future Medical Expenses
The plaintiffs' economic expert, Mr. Asher, noted that Mr. Jenkins's life expectancy at the time of trial was 44.1 years. Based upon that life expectancy and the mid-range amounts and frequency of costs detailed in Mr. Hegwood's life care plan, he estimated the present value of the medical services to be $1,313,047.00. The jury awarded Mr. Jenkins that sum for future medical expenses, and the trial court's judgment reduced it by 10% to $1,181,742.30.[10] Although the jury's award for that element was understandably not itemized with particularity, the jury obviously accepted Mr. Asher's estimate and the argument of the plaintiffs' counsel regarding the total amount, which included the potential costs of spinal surgery as estimated by Dr. Dietze and cataloged by Mr. Hegwood in his life care plan.
In order to recover future medical expenses, the appellate record must establish that future medical expenses will be necessary and inevitable. Levy v. Bayou Indus. Maint. Services, Inc., 03-0037, p. 8 (La.App. 1st Cir.9/26/03), 855 So.2d 968, 975, writ denied, 03-3161 (La.2/6/04), 865 So.2d 724, 03-3200 (La.2/6/04), 865 So.2d 727. An award of future medical expenses will not be supported in the absence of medical testimony that they are indicated and setting out their probable cost. Id. (Emphasis supplied.)
The evidence simply does not support a finding that the potential spinal fusion surgery was more likely than not to be necessary, particularly in light of the undisputed fact that the epidural spinal injections, the first treatment alternative supposedly accepted by Mr. Jenkins, had not yet been performed by the time of trial. Further, our review of the record shows that the figure proposed by Mr. Asher incorrectly includes the surgical cost associated with both alternative surgical procedures discussed by Dr. Dietze, or $63,647.33, rather than the cost of either of those potential alternatives ($25,647.33 or $38,000.00). It was error to include the medical costs associated with those procedures as well According to Mr. Hegwood's life care plan, those costs included a one-time post-surgery physical therapy evaluation ($90.00), and eight weeks of post-surgery *777 physical therapy ($1,560.00). Thus, we accordingly reduce the jury's award of future medical expenses of $1,313,047.00 by a total of $65,297.33, prior to appropriate reduction based upon the apportionment of fault.

Loss of Household Services
DOTD challenges the evidentiary and theoretical basis of the jury's award of $87,215.00 to Mr. Jenkins for the loss of household services, an amount calculated by Mr. Asher based upon the assumption that the value of the household services and duties he formerly was able to perform was $250.00 per month, or $3,000.00 annually.
Louisiana law allows, as an element of damages, reasonable housekeeping expenses necessitated by the incapacity of an injured spouse. Levy, 03-0037 at p. 17, 855 So.2d at 979. There is sufficient evidence in the record to support the jury's finding that Mr. and Ms. Jenkins sustained an actual pecuniary loss of household services due to his injuries and impairment. We find no error in the jury award of this element of damages.

Loss of Consortium, Service, and Society
Louisiana Civil Code article 2315(B) authorizes the recovery of loss of consortium, service, and society as damages by the spouse and children of an injured person. These elements of damages include such pecuniary elements as loss of material services and support and such nonpecuniary components as loss of love, companionship, affection, aid and assistance, society, sexual relations, comfort, solace, and felicity. See Emery v. Owens-Corporation, 00-2144, p. 20 (La.App. 1st Cir.11/9/01), 813 So.2d 441, 456, writ denied, 02-0635 (La.5/10/02), 815 So.2d 842, and Moore v. Safeway, Inc., 95-1552, (La. App. 1st Cir.11/22/96), 700 So.2d 831, 860, writs denied, 97-2921 (La.2/6/98), 709 So.2d 735, 97-3000 (La.2/6/98), 709 So.2d 744. The elements of a child's claim for loss of service and society are essentially the same as those of the injured person's spouse without, of course, the sexual component of spousal consortium. See Moore, 95-1552, 700 So.2d at 860.
DOTD contends that all of the jury's awards for loss of consortium, services, and society were excessive and abuses of discretion.[11] Although we cannot conclude, given the evidence, that the jury abused its discretion in the amount of its awards for loss of consortium, services, and society, we must agree with DOTD's contention that the final awards for such damages contained in the trial court's judgment are legally excessive. At the time of the accident at issue, La. R.S. 13:5106(B)(1) provided:
B. (1) In all suits for personal injury to any one person, the total amount recoverable, including all derivative claims, exclusive of property damages, *778 medical care and related benefits and loss of earnings, as provided in this Section, shall not exceed five hundred thousand dollars.[12]
Louisiana Revised Statutes 13:5106 provides that "`[d]erivative claims' include but are not limited to claims for survival or loss of consortium." In Engles v. City of New Orleans, 03-0692, pp. 32-3 (La.App. 4th Cir.2/25/04), 872 So.2d 1166, 1186-87, writs denied, 04-1432 (La.9/24/04), 882 So.2d 1141, 04-2654 (La.1/7/05), 891 So.2d 697, the primary plaintiff was injured in a fall from his bicycle caused by a street defect. The court held that a claim for loss of consortium under La. C.C. art. 2315(B) is a derivative claim, derived from the personal injuries sustained by the primary victim. It therefore held that the award of the maximum $500,000.00 in general damages to the primary plaintiff served to legally extinguish his wife's derivative claim for loss of consortium pursuant to La. R.S. 13:5106(B)(1), and reversed the trial court's award of $100,000.00 for such damages.[13]
Here, the trial court reduced Mr. Jenkins's general damages to the net amount of $450,000.00, based upon the 10% fault assessed to Officer Dorsett and the Town of Franklinton. As in Engles, this award serves to legally extinguish the derivative awards for loss of consortium, services, and society, as the maximum recoverable amount of $500,000.00 in general damages applied to both DOTD and the Town of Franklinton, as a political subdivision of the state, and that maximum recoverable amount as applicable to DOTD was in turn reduced by reason of fault apportioned to the Town of Franklinton, with whom the plaintiffs compromised prior to trial. We therefore reverse the trial court's judgment in part, and vacate the awards of damages for loss of consortium, services, and society for Ms. Jenkins and the minors, Dillon Jenkins, Baliegh Jenkins, Nathan Jenkins, and Hayden Jenkins.

DECREE
For the reasons set forth in this opinion, the judgment of the trial court, apportioning the degree or percentage of fault, is affirmed. We reverse and vacate the trial court's awards for loss of consortium, services, and society to the plaintiff, Jennifer C. Jenkins, and the plaintiffs, Shad Everett Jenkins and Jennifer C. Jenkins, on behalf of their minor children, Dillon Shad Jenkins, Baliegh Victoria Jenkins, Nathan Cade Jenkins, and Hayden Reid Jenkins. We further reverse in part and amend the trial court's judgment to fix the total net amounts of damages, after application of the statutory cap of La. R.S. 13:5106(B)(1) and reduction of the fault apportioned to the Town of Franklinton, as follows:

 SHAD EVERETT JENKINS
General Damages: $ 450,000.00;
Past Medical Expenses: $ 109,266.45;
Future Medical Expenses: $1,122,974.70;
Past Wage Loss: $ 76,500.00;
Future Wage Loss: $1,836,747.90;
 SHAD EVERETT JENKINS AND
 JENNIFER C. JENKINS
Loss of Household Services: $ 78,493.50.

Based upon the foregoing,
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the plaintiff, Shad Everett Jenkins, and against the defendant, the State of Louisiana, through the Department of *779 Transportation and Development, for the sum of $3,595,489.05, and in favor of the plaintiffs, Shad Everett Jenkins and Jennifer C. Jenkins, and against the defendant, the State of Louisiana, through the Department of Transportation and Development, for the sum of $78,493.50, together with legal interest thereon as provided by law, and for all costs of the trial court proceedings.
The costs of this appeal are apportioned to the parties as follows: 10% to the plaintiffs, Shad Everett Jenkins and Jennifer C. Jenkins; and 90% to the defendant, the State of Louisiana, through the Department of Transportation and Development, the portion of the defendant, the State of Louisiana, through the Department of Transportation and Development, being fixed at $5,254.20.
REVERSED AND AMENDED IN PART; AFFIRMED IN PART.
KUHN, J., concurs in the result.
WELCH, J., concurs.
NOTES
[1] The evidence confirms that Ms. Jenkins was pregnant at the time of the accident. Mr. Jenkins testified that he and his wife learned of her pregnancy the day prior to the accident, and the twins were born on April 30, 2004.
[2] The net judgment amount represents 90% of the total amount of all damage awards after the trial court first reduced Mr. Jenkins's general damages award to $500,000.00. Thus, the figure of $7,541,038.05 incorporates a 10% reduction of each damages award, including the $500,000.00 limit in general damages, reducing each award as follows:

General Damages: $ 450,000.00;
Past Medical Expenses: $ 109,266.45;
Future Medical Expenses: $1,181,742.30;
Past Wage Loss: $ 76,500.00;
Future Wage Loss: $5,060,035.80;
Loss of Household Services: $ 78,493.50;
Ms. Jenkins's Loss of
Consortium: $ 225,000.00;
Dillon Jenkins's Loss of
Consortium: $ 90,000.00;
Baliegh Jenkins's Loss of
Consortium: $ 90,000.00;
Nathan Jenkins's Loss of
Consortium: $ 90,000.00;
Hayden Jenkins's Loss of
Consortium: $ 90,000.00.
TOTAL: $7,541,038.05.

[3] The statute has since been amended by Acts 2006, No. 545, § 1, which added subsection (H), limited to damages arising from Hurricanes Katrina and Rita and their aftereffects.
[4] The record is silent, however, concerning Mr. Wicker's speed at the time he lost control of his truck.
[5] Mr. McClendon also admitted that during the family trip on Highway 25, it was necessary for him to drive with his passenger's side tires close to the shoulder and his driver's side tires near the middle of the lane in order to avoid the ruts filled with water.
[6] Using the standards of the official state motor vehicle inspection manual, admitted into evidence, the best tire, the left front, had tread varying from 4/32 to 5/32 of an inch. The left rear tire had tread depth of less than 2/32 of an inch. The right front tire had virtually no tread depth. The right rear tire had tread depth of about 1/32 of an inch. The section of the Louisiana Administrative Code regulating safety inspections of required equipment on motor vehicles provides the following regarding tires:

3. Tires without tread wear indicators shall have 2/32 inch tread remaining when measured in any two adjacent major grooves at a minimum of three locations spaced approximately equal distance around the major tire groove.
4. Tires with tread wear indicators shall not allow the indicators to contact the road in any two adjacent major grooves at three locations spaced equally around the tire.
La. Admin. Code, Title 55, Pt. III, § 813(AA)(3),(4).
[7] Commenting upon eyewitness testimony in that case, the supreme court observed that "there is quite a bit of difference between a `wet roadway' and a puddle of standing water." Id.
[8] The evidence shows that a basilar skull fracture was suspected earlier in the course of treatment, but diagnostic studies could neither confirm nor rule out its existence.
[9] Reviewing the plaintiffs' 2005 federal income tax return, including Schedule C, "Profit or Loss from Business," we note that Mr. Jenkins's business reported no wages, commissions or fees, or contract labor expenses, as would be expected of a business having actual employees. Rather, under "other expenses," an expense of $47,262.00 for "yard labor" was listed. No evidence was presented to factually substantiate Mr. Asher's assumption that Robbie Thomas's business was fairly comparable to that of Mr. Jenkins, such as documentation of the number of employees, assets, gross earnings, equipment, business reputation, size of client market, or nature of clientele. See, e.g., Bolton, 609 So.2d at 1143. More importantly, there was no basis shown to substantiate Mr. Asher's revenue and profit assumptions relating to his second scenario, involving two two-man crews. The Robbie Thomas "affidavit" was not introduced into evidence, but even Mr. Asher's description of its contents showed that it related to a business with one two-man crew, and there is no suggestion in the record that the "affidavit" contained relevant information or reliable projections upon which the second scenario could reasonably be based.
[10] Acts 2000, 1st Ex.Sess., No. 20, § 1, effective on July 1, 2000, amended La. R.S. 13:5106 to add subparagraph (B)(3)(c), which provides, in pertinent part:

In any suit for personal injury against the state or a state agency wherein the court pursuant to judgment determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, the court shall order that all medical care and related benefits incurred subsequent to judgment be paid from the Future Medical Care Fund as provided in R.S. 39:1533.2. Medical care and related benefits shall be paid directly to the provider as they are incurred.... (Emphasis supplied.)
The trial court's judgment did not comply with the express terms of the statute. (Parenthetically, we note that the judgment was evidently prepared and submitted to the court by the plaintiffs' counsel, as his letterhead appears in the margin.) It might be argued that we could assert our inherent authority under La. C.C.P. art. 2164 to amend the judgment to conform to the statute, on the grounds that such amendment would only affect the manner of satisfaction of the damages amount without affecting the substance of the award. However, the court in Scott v. Roberts, 04-953, 04-721 (La.App. 3rd Cir. 12/8/04), 889 So.2d 446, writ not considered, 05-0105 (La.3/18/05), 896 So.2d 990, reached a contrary conclusion as to the substantive character of such an amendment, and further held that the state's failure to raise the issue on appeal precluded such amendment. We likewise decline to address this issue sua sponte.
[11] As to the awards to the minor twins, Nathan Jenkins and Hayden Jenkins, DOTD points out that those minors were unborn at the time of the accident, but fails to specify any legal significance regarding that circumstance. Although under our law natural personality commences at birth, an unborn child must nevertheless be considered as a natural person for whatever relates to its interests from the moment of conception. La. C.C. arts. 25, 26. Nathan and Hayden were conceived prior to the accident Thus, the plaintiffs could properly assert causes of action on those minors' behalf to recover damages for their loss of parental consortium, services, and society. See Mason v. Luther, 05-25, p. 3 (La.App. 3rd Cir.6/1/05), 903 So.2d 1145, 1148-49. Significantly, DOTD does not seem to dispute the existence of the causes of action for those minors' damages; rather, it challenges only the quantum of the awards.
[12] The statutory language was subsequently amended to its present form by Acts 2005, No. 1, § 1, effective May 27, 2005.
[13] But cf. Lockett v. State, Dep't of Transp. & Dev., 03-1767 (La.2/25/04), 869 So.2d 87, interpreting La, R.S. 13:5106(B)(2), relating to the statutory cap on wrongful death claims.